PLAINTIFFS' EXHIBIT 2

To:      Scott M. Moore, Esq., Moore International Law PLC
From:   Lisbeth Claus, Ph.D., Willamette University
Date:    December 31, 2018
Re:      Expert duty of care report for Civil Action No 18-cv-0057

# OUTLINE OF THE PRELIMINARY DUTY OF CARE EXPERT REPORT

- Introduction                                                        Page 2
- Executive Summary                                                   Page 3
- Context of Duty of Care
  Duty of Care and International NGOs                                 Page 7
  Malaria and Business Travel                                        Page 8
  Standard Recommended Malaria Protocol for Employers                Page 9
- Audit of the 8-Step Integrated Duty of Care Risk Management Model
  Applied to ICTJ                                                    Page 13
- PLAN
  Step 1: Assess Risk                                                Page 14
  Step 2: Plan Strategically                                         Page 19
  Step 3: Develop Policies and Procedures                            Page 24
- DO
  Step 4: Manage Mobility                                            Page 32
  Step 5: Communicate, Educate, and Train                            Page 36
  Step 6: Track and Inform                                           Page 37
  Step 7: Advise, Assist, and Evacuate                               Page 39
- CHECK
  Step 8: Control and Analyze                                        Page 40
- Conclusions                                                         Page 41
- Appendices
  Appendix 1                                                         Page 42
  Appendix 2                                                         Page 43
  Appendix 3                                                         Page 44
- Expert statement                                                    Page 45

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)      001198
Plaintiffs Disclosures

# INTRODUCTION

The purpose of this report is twofold:

1. Audit the duty of care activities of the International Center for Transitional Justice (ICTJ), an international NGO, as they relate to the death of their Brussel's office staff member Himzir Ziga from malaria—a disease he contracted during a business trip in Côte D'Ivoire.
2. Provide an expert opinion on how ICTJ assumed (or failed to assume) its duty of care obligations in that case.

This report relies on three basic sources:

1. The defendant and plaintiff materials I received from Scott M. Moore, Esq., Moore International Law PLLC for review (page# in parentheses in this report relate to these documents).
2. Prevailing duty of care published knowledge as it related to international NGOs, international government organizations (such as the United Nations and European Union), and general duty of care practices of employers at the time of the incident (2015).
3. My academic and professional expertise and publications in the area of duty of care including over 150 life duty of care presentations, webinars and workshops on four continents from 2009 until now.

This report should inform the parties involved with regard to:

- What ICTJ should reasonable have known (at the time of the incident) about their duty of care obligations.
- The plans, policies, and procedures (if any) ICTJ had in place to assess and mitigate the "foreseeable" risk of Himzir Ziga's contracting malaria prior to his trip to Côte D'Ivoire.
- The assistance ICTJ provided (or could have) while Himzir Ziga was on location in Abidjan.
- The extent to which ICTJ responded to the incident in an appropriate and timely manner between the return of Himzir Ziga from this business trip to Côte D'Ivoire and his ultimate death.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001199
Plaintiffs Disclosures

# EXECUTIVE SUMMARY

In completing this audit of how ICTJ assumed (or failed to assume) its duty of care obligations based on prevailing practices as an employer and an international NGO, it is my expert opinion that ICTJ and its agents in New York, Brussels, and Abidjan failed to follow duty of care baseline and best practices in at least seven of the eight steps of the Integrated Duty of Care Risk Management Model© that are common practice in the management of (international) business travelers for corporations, government organizations and NGOs.

Based on the incomplete materials provided to me, it is my professional opinion that ICTJ breached its duty of care obligation towards their staff member Himzir Ziga resulting in him contracting malaria on his business trip to Côte D'Ivoire and ultimately dying from the disease.

This report is based on documents provided by both the plaintiff and the defendant. However, the ICTJ documents to draft this report are limited to the employment contract of Himzir Ziga, ICTJ's Employee Handbook, ICTJ's Travel & Expenditure Policy New York and International at the time of time of the incident and subsequent updates, and selected emails—the majority of them dealing with the settling of the estate after Himzir Ziga's death rather than the period preceding his death. Without reviewing company emails and SMSs communications related to a dozen named ICTJ employees, there are evidentiary gaps and it is difficult to fully reconstruct the actions of ICTJ prior, during and after the duty of care incident.

Even with these evidentiary gaps, this report shows that ICTG breached its duty of care obligation by failing to follow most baseline duty of care practices required from employers (including international NGOs) especially when sending their employees to work on their behalf in dangerous locations.

## PLAN PHASE

### Step 1: Assess Risk

ICTJ did not meet the duty of care baseline in step 1 by failing to conduct a formal assessment of foreseeable travel risks of its employees.

- ICTJ likely failed to conduct a formal assessment of the foreseeable travel risk to Côte D'Ivoire prior to Himzir Ziga's departure (and likely including the other employees and contractors traveling with him).
- Had ICTJ done a basic risk assessment prior to departure, it would have revealed the high foreseeable risks of malaria for business travelers to Côte D'Ivoire.
- There is no evidence that there was a formal travel authorization of Himzir Ziga's trip as required by ICTJ's stated travel policy.
- The absence of the use of Travel Management Company (TMC) for travel booking and/or an assistance vendor for travel tracking and medical assistance also likely resulted in not getting a medical alert of the risks of traveling to a malaria-endemic country prior to Himzir Ziga's travel.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001200
Plaintiffs Disclosures

## Step 2: Plan Strategically

ICTJ did not meet the duty of care baseline in step 2 by failing to develop strategic and operational duty of care plans.

- Himzir Ziga's employment contracts did not mention travel as an essential function of his job responsibilities.
- There is no evidence that leadership at ICTJ developed and implemented an integrated risk duty of care strategy for international staff travel in its various worldwide locations.
- There is no evidence that ICTJ had any operational and/or incident management plans for Himzir Ziga's regular travel to a high-risk country such as Côte D'Ivoire, or for other traveling employees despite the probable security and medical rissk encountered by their employees and contractors based on their international travel profile to dangerous countries.
- ICTJ has an opt-in medical insurance coverage for the travel of its international staff rather than automatic enrollment.

## Step 3: Develop Policies and Procedures

ICTJ did not meet the duty of care baseline in step 3 by focusing its travel management policies on cost control rather than on mitigating employee (medical) risk.

- ICTJ has limited travel policies compared to the baseline duty of care policies of other employers including NGOs.
- ICTJ's travel policy has a strong cost containment focus with the aim of minimizing travel costs.
- ICTJ's travel policy is more of an expenditure policy than an employer duty of care/employee protection policy.
- ICTJ staff is encouraged to book travel online for trips that are unlikely to change rather than using a TCM.

## DO PHASE

## Step 4: Manage mobility

ICTJ did not meet the duty of care baseline in step 3 by failing to appropriately manage HimZir Ziga's business trip to (and from) Côte D'Ivoire (I come to this conclusion based on the materials available to me in spite of evidentiary gaps in the management of Himzir Ziga's mobility).

- A copy of Himzir Ziga's travel authorization and other documents (such as ICTJ company emails) would allow for a more precise timeline of events.
- Himzir Ziga's travel to a company-owned office abroad, puts the co-responsibility for duty of care on the local ICTJ Côte D'Ivoire staff as they are very much aware of the risk of foreign travelers contracting malaria in their country.
- ICTJ failed to take relatively inexpensive preventive measures (an average of $500-$800 per person) to prevent Himzir Ziga from contracting malaria.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001201
Plaintiffs Disclosures

- Santa Falasca (Himzir Ziga's direct supervisor) contributed to ICTJ's negligence by knowing Himzir Ziga had symptoms after he returned from his business trip to Côte D'Ivoire and by sending him to a general practitioner rather than an infectious disease specialist.

## Step 5: Communicate, Educate, and Train

ICTJ did not meet the duty of care baseline in step 5 by failing to provide duty of care awareness, education and training on how mitigate the foreseeable risk of malaria prior to Himzir Ziga's business travel to Côte D'Ivoire.

- There is no evidence that Himzir Ziga was educated and trained by ICTJ on the ABCD of malaria prior to his departure.
- There is no evidence that Santa Falasca was educated and trained by ICTJ on the ABCD of malaria as Himzir Ziga's supervisor.

## Step 6: Track and Inform

ICTJ did not meet the duty of care baseline in step 6 by failing to recommend the use of an approved TMC for travel booking or contracting with a medical assistance vendor for support.

- There is no evidence that ICTJ HQ, local Abidjan staff (or an ICTJ partner TMC or medical assistance provider) tracked and informed Himzir Ziga of the medical risks of preventing and contracting malaria while working in the Abidjan, Côte D'Ivoire office.

## Step 7: Advise, Assist and Evacuate

Based on the limited information provided to me, ICTJ did not meet its "advise and assist" duty of care baseline in step 7.

- Santa Falasca failed to sent Himzir Ziga to an appropriate and available Belgian medical provider upon knowledge of his illness and malaria-like symptoms when he was ill upon his return from a business trip to Côte D'Ivoire.
- In order to reconstruct the timeline and evaluate more effectively whether ICTJ met its duty of care obligation in step 7, I would need access to company emails and text communications between key ICTJ employees (cf. list of people in appendix 2) from 9/1/2015 (when Santa Falasca planned the audit of the EU program in Côte D'Ivoire) to 1/13/16 (the time of Himzir Ziga's death). This is not an onerous request for an organization like ICTJ (cf. appendix 3).

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

## CHECK PHASE

### Step 8: Control and Analyze

I cannot draw a conclusion whether ICTJ met the duty of care baseline in step 8 due to incomplete information.

- In order to reconstruct the timeline and evaluate whether ICTJ met its duty of care obligation in step 8, I would need access to company emails and text communication between key ICTJ employees (cf. list of people in appendix 2) from 12/19/2015 (when ICTJ became aware of Himzir Ziga's malaria diagnosis) and 2/15/17 (when ICTJ's president was served papers by the French lawyer). This this not an onerous request for an employer like ICTJ (cf. appendix 3).

## CONCLUSION

ICTF failed to meet common baseline duty of care practice in seven of the eight steps of the Integrated Duty of Care Risk Management Model. ©

The most egregious mistakes in the "**Plan**" phase were the lack of risk assessment for travel to its international offices and in particular Côte D'Ivoire (step 1); failure to have a common standard malaria protocol in place (step 2); and prioritizes cost containment over employee protection in its travel management policies (step 3).

The most egregious mistakes in the "**Do**" phase were the failure to take relatively inexpensive preventive measures (an average of $500-$800) to prevent Himzir Ziga from contracting malaria that ultimately took his life(step 4); failure to properly train and prepare Himzir Ziga and Santa Falasca to prevent and recognize the early symptoms of malaria (step 5); possible omission of the local, knowledgeable ICTJ Abidjan staff to monitor and report possible breach of compliance of their visiting foreign colleague (step 6); and failure of Santa Falasca to sent Himzir Ziga to an appropriate and available Belgian medical provider upon knowledge of his illness and malaria-like symptoms (Step 7).

In doing so, ICTF failed to take reasonably foreseeable action to prevent Himzir Ziga from contracting malaria and failed to support him with appropriate treatment when becoming aware of his symptoms ultimately resulting in his death. As a result, ICTJ opened itself up for legal liability, reputational risk and program continuity.

When auditing the duty of care practices in my consulting work with global employers (corporations, government organizations, and NGOs)—especially those sending employees to dangerous locations—I always emphasize that, in terms of incidence and prevalence, medical risks are much greater than perceived and real security risks. Medical risks are also more certain (in terms of probability of occurring) and preventable and controllable than black swan-like security incidents. I use malaria as an example of an entirely (low cost) preventable illness, a treatable illness when dealt with at the onset of the symptoms, but one that can easily leads to the death of the traveler if protocols are neglected.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

# CONTEXT OF DUTY OF CARE
## BUSINESS TRAVEL AND MALARIA

In setting the context, I review prevailing knowledge about duty of care for NGOs; business travel to malaria endemic countries; general malaria awareness, prevention, and treatment; and the standard recommended malaria duty of care protocol for employers to fulfil their duty of care obligations.

## Duty of Care and International NGOs

*"Duty of care" implies that individuals and organizations have legal obligations to act toward others and the public in a prudent and cautious manner to avoid the risk of reasonable foreseeable injury to others.*
(Claus, 2010, p. 29).

At the time of the incident (2015), the prevailing information on the duty of care obligations of (international) NGOs was available to management in North America and Europe through various publications, webinars and presentations by experts on duty of care at events commonly attended by international NGO administrators. Personally, I have spoken at duty of care events in Washington, DC, New York, and Europe, specifically geared at international NGOs and international government organizations, and at travel management events where NGO administrators were in the audience. Many of these engagements were through International SOS, a leading firm used by employers (including NGOs) to support them in their duty of care legal and moral obligations.

Since at the time of the incident, duty of care publications were available and widely distributed to NGOs and responsible management parties. The New York Headquarters of ICTJ should have been cognizant of their duty of care obligation as an (international) employer. In addition, many of the executives and staff at ICTJ (in New York, Brussels and The Hague) have previous work experience with international government organizations such as the United Nations and the European Union—both having best practices when it comes to duty of care and travel management of their employees and contractors.

Prevalent NGO management information on duty of care was published and widely distributed as a public service to employers (including international NGOs) prior to the incident.[1] While the legal duty of care framework (and its remedies) is different for (international) government organizations, NGOs fall under the same legal duty of care obligations as corporations. The fact that they operate as non-profits, may have less resources (although this is not always the case), and are more mission driven does not exempt them from taking care of the health, safety and security of their employees

---

[1] Claus, L. *Duty of Care of Employers for Protecting International Assignees, their Dependents, and International Business Travelers.* White Paper, London: AEA International Pte. Ltd., 2009; Claus, L. (2009). *Le Devoir de Protection des employeurs à l'égard des expatriés, de leurs personnes à charge et des voyageurs d'affaires.* Livre Blanc, Paris: International SOS; Claus, L. (2010). International Assignees at Risk: Employers have a duty of care for workers around the globe. Your Employer's Duty of Care Responsibilities. *HR Magazine,* Vol. 55, No. 2, 73-75; Claus, L. (*Duty of Care and Travel Risk Management Global Benchmarking Study.* London : AEA International Pte. Ltd., 2011; Claus, L. and Giordano, E. (2013). Global employer duty of care: Protecting the health, safety, security and well-being of employees crossing borders. Pp. 279-299 in Claus. L. (ed.), *Global HR Practitioner Handbook.* Silverton, OR: Global Immersion Press; Claus, L. (2015). *Duty of Care NGO Special Reports: A Comparison of Duty of Care Metrics and Analytics with the Global Benchmarking Study.* London : International SOS Foundation.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

and contractors when they travel on their behalf. Duty of care is truly about an employer's approach to taking care of its community from within – its workforce living or traveling on behalf of the company. Some organizations align this to their corporate social responsibility (CSR) mission and/or corporate sustainability initiatives.

## Malaria and Business Travel

*Malaria is an entirely preventable and treatable mosquito-borne illness*
(World Health Organization).

Malaria in humans is a serious disease caused by a family of parasites (called Plasmodium)[2] spread by the bite of an infective female mosquito.[3] It occurs in countries with tropical and subtropical climates such as Côte D'Ivoire. Millions of people are infected each year and thousands of them die of the disease. According to the World Health Organization (WHO), World Malaria Report 2015[4], an estimated 438,000 people died of malaria in 2015 mostly in the African Region (90%). The incidence rate of malaria has dropped since 2000 and many countries have even moved towards malaria elimination. It still occurs in nearly 100 countries worldwide and remains heavily concentrated in 15 countries particularly in Sub-Saharan Africa and South Asia.[5]

Although the overall malaria numbers are decreasing (especially in local populations), the number of cases of malaria in travelers has been increasing[6]. Since the disease is entirely preventable and treatable, employers must take appropriate precautions when sending employees to malaria-endemic regions and countries with moderate, high to extreme risk (cf. The Malaria Map in appendix).[7] Lack of pre-travel preparedness—key to mitigating the risk of malaria—for business travelers going to malaria-endemic areas results in unnecessary risk exposure to the disease and sometimes death.[8]

## Malaria awareness, prevention and treatment

*Malaria can often be avoided using the ABCD approach to prevention.*
*(Awareness, Bite prevention, Chemoprophylaxis, Diagnosis and treatment)*

In the past decade, awareness of malaria among people is increasing mainly as a result of the efforts of WHO, the Annual Malaria Day, the Center for Disease Control (CDC), and the funding of major malaria initiatives by NGOs/foundations (especially the Bill and Melinda Gates Foundation and the Clinton Foundation). Malaria awareness of employers has also greatly increased in corporations, international government organizations and international NGOs who have frequent global mobility among their employees (especially business travelers, international assignees and dependents)

---

[2] Malaria Day 2016  Podcast, 2 May 2017, International SOS
[3] CDC (Chapter 3: Infectious diseases related to travel)
[4] Fact Sheet: World Malaria Report 2015, 9 December 2015)
http://www.who.int/malaria/media/world-malaria-report-2015/en/
[5] Malaria Strategy Overview
[6] CDC (Chapter 3: Infectious diseases related to travel)
[7] The Malaria Map: Malaria Risk Areas across the Globe.
[8] Preparedness key to mitigating malaria + zika update.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

through the education efforts of assistance vendors (like International SOS) and professional organizations (like InsideNGO).

The ABCD of malaria—developed by WHO for World Malaria Day to increase awareness of how to prevent the disease[9]—provides an easy acronym for employers and employees alike (cf. figure 1).

## Figure 1: The ABCD of Malaria[10]

| A | **A**wareness | <ul><li>Be aware of the risk, the incubation period, the possibility of delayed onset, and the main symptoms.</li><li>Know the symptoms: fever, shivers, headache, body aches, vomiting and diarrhea (similar to flu systems).</li></ul> |
|---|---|---|
| B | **B**ite prevention | <ul><li>Avoid being bitten by mosquitoes, especially between dusk and dawn.</li><li>Use an effective insect repellent on exposed skin.</li><li>Wear long clothing (long sleeves, long pants, socks and shoes) to cover as much skin as practical.</li><li>Sleep under an insecticide-treated bed net.</li></ul> |
| C | **C**hemoprophylaxis | <ul><li>Take antimalarial drugs (Chemoprophylaxis) when appropriate to prevent infection from developing into a clinical disease.</li><li>See your doctor 6-8 weeks prior to departure for recommendation on prescribed preventative medication.</li><li>Take anti-malaria medication exactly as prescribed before, during and after travel.</li></ul> |
| D | **D**iagnosis and treatment | <ul><li>Immediately seek diagnosis and treatment if a fever develops one week or more after entering an area where there is a malaria risk and up to three months (or, rarely, later) after departure from a risk area.</li><li>Tell your doctor that you have traveled to an area with malaria.</li><li>Early diagnosis and treatment prevent death.</li></ul> |

## Standard Recommended Malaria Protocol for Employers

The standard recommended protocol for companies to follow (as suggested by WHO and the CDC) is based on the ABCD model and includes the following steps:

1. Assess medical risk prior to departure and flag employees traveling to a malaria-endemic country.
2. Require and pay for a pre-trip medical visit of the traveler.

---

[9] http://www.who.int/ith/ITH_chapter_7.pdf http://www.who.int/ith/diseases/malaria/en/
[10] Source: Compiled from WHO and International SOS. http://www.who.int/ith/diseases/malaria/en/ Malaria Podcast, 12 April 2017.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

3. Provide (and pay for) prescribed vaccinations/medications.
4. Ensure that the traveling employee (and their supervisor) has appropriate pre-departure awareness, education, and training about malaria.
5. Ensure six to eight weeks between the travel authorization/booking and the actual departure date of the employee.
6. Ensure vector control on location.
7. Provide assistance during the trip and check, prior to returning home, whether the traveling employee is infection free.
8. Follow-up after the trip.

## 1. Assess medical risk prior to departure and flag employees traveling to a malaria-endemic country

The employer must have a system in place to ensure that medical risk of any business traveler is properly assessed prior to departure. Any employee traveling (short or long-term) to a malaria-endemic country must trigger a "medical travel alert" prior to travel where the traveler is flagged by the authorized (and vetted) corporate travel management vendor at the time of booking or internally identified by the employer through the travel authorization process. As soon as the traveler has been flagged, the employer advises the employee of the risk and follows the standard recommended malaria prevention and treatment protocol for the business traveler to the malaria-endemic country.

## 2. Require and pay for a pre-trip medical visit of the traveler

The policy for travel to a country with "high" or "extreme" medical risk of an infectious disease (as is the case for malaria in Côte D'Ivoire) usually requires the employee to undergo a pre-trip medical visit in order to obtain the necessary vaccinations and/or other medications. In the case of malaria, the medical visit should take place a few weeks prior to departure to determine the appropriate chemoprophylaxis or artemisinin-based combination therapies (ACTs). The employer pays the cost of the medical visit as part of the cost of sending an employee abroad.

## 3. Provide (and pay for) prescribed vaccinations/medications

In the case of malaria, the employee will be required to take prescribed medication before, during and after the trip or be advised by the physician of an alternative regimen. The prescribed medical regimen is based on the specific person/travel risk assessment done by the physician and agreed upon by the employee/patient. Factors taken into consideration are:

- The severity of malaria risk in the (host) country (cf. medical risk map).
- Travel areas within the country (urban vs rural).
- Type of accommodation on location (exposure to non-vector controlled environment).
- Length of stay (the longer the duration, the greater the risk of exposure).

When dealing with travel to countries with high risk of contracting an infectious disease, baseline duty of care practice for the employer is to pay for the vaccination/medications. Existing (health and compliance) risk factors of the traveling employee are also taken into account.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Due to overall low compliance of business travelers with the prescribed malaria regimen, a *leading* duty of care practice is for the employer to encourage and/or nudge the employee to follow the prescribed regimen and ensure that they can renew their prescriptions in case they run out medication while on their trip. Due to available communication technology, behavioral nudging is now widely considered an easy leading practice to follow as it is usually done via email, an app, and part of the services offered by TMCs and medical assistance vendors partnering with the employer to assist the employee.

### 4.  Ensure that the traveling employee (and their supervisor) has appropriate pre-departure awareness and education about malaria

It is the duty of care responsibility of the employer not only to assess "foreseeable" risk prior to departure but also to inform the traveling employee of the risk, and educate and train them on the mitigation practices that they have put in place to protect them. Supervisors of employees who frequently travel to malaria endemic countries are also be made aware of the risk of malaria so that they support employee compliance. At a minimum, education and training regarding traveling to a malaria-endemic country would include the following:

- Explain the ABCD of malaria and the need for compliance with medication regimen.
- Educate the employee on the use of vector control (exposure, clothing, night time when mosquitoes are more active, bed nets, and insecticide).
- Ensure the employee (and their supervisor) can identify the symptoms of malaria, what to do when they arise, where and when to seek (immediate and appropriate) treatment while abroad and after they return.

### 5.  Ensure six to eight weeks between the travel authorization/booking and the actual departure of the employee

This step is of utmost importance as the employee will need to have a pre-trip medical visit and comply with a prescribed medication regimen for a certain period prior to departure. As part of their duty of care control obligation, employers should not authorize an employee to travel to a malaria-endemic country without the necessary waiting period for the malaria prophylaxis to be effective. Usually the entire process from travel medical alert, to medical visit, to taking medication takes about six to eight week. Although some anti-malaria medication can be started shortly before departure, they tend to be more expensive.

### 6.  Ensure vector control on location

Vector control is one of the most effective ways to prevent malaria. Therefore, the employer provides the employee with an insecticide-treated mosquito net (ITNs) and indoor residual spraying (IRS) on location or uses vetted (hotel) accommodations that provide approved vector control. Vetting whether the accommodation meets these vector control criteria is the responsibility of the employer but is usually part of the service of the TMC recommending the use of vetted hoteld.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001208
Plaintiffs Disclosures

7. **Provide assistance during the trip and check, prior to returning home, whether the traveling employee is infection free**

The employer ensures that employee will not be running out of prescribed medication (especially for longer stays during extended travel) and uses behavioral nudging to remind the employee to take their prescribed medications. When the employee experience symptoms during their trip, the employer provides immediate and appropriate medical assistance and considers evacuation in case of emergency. Even when the traveler has no symptoms, best practice is to require the employee (with right of refusal) to take a rapid diagnostic test (RDTs) before leaving a high-risk malaria-endemic country to ensure that the employee is not infected. The employer pays for that test.

8. **Follow-up after trip**

Upon return, the employer/supervisor reminds the employee to complete the medication regimen upon return (again nudging the employee through email/app is an easy tool). The employee has been warned through prior education and training to seek immediate and appropriate medical attention for malaria (flu like) symptoms and to disclose recent travel to a malaria-endemic country to the medical provider. By the same token, if the supervisor becomes aware the employee experiences such symptoms, s/he urges their employee to seek appropriate medical care without delay and reminds them to disclose their recent travel to the medical provider.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001209
Plaintiffs Disclosures

# AUDIT OF THE 8-STEP INTEGRATED DUTY OF CARE RISK MANAGEMENT MODEL APPLIED TO ICTJ

In mitigating 'foreseeable" duty of care risk it is customary to use the leading 8-Step (Plan-Do-Check) Duty of Care Integrated Risk Management Model© (Claus, 2010; Claus and Giordano, 2013). In auditing the duty of care obligations of ICTJ, each step of the model is illustrated in terms of baseline and best practices using the information sources at my disposal, customary duty of care management knowledge available at the time of the incident, and its applicability to ICJT as an international NGO.

The Duty of Care Integrated Risk Management Model is comprised of eight steps in accordance with the "Plan-Do-Check" cycle. While each step is audited on its own merit, it should be noted that they each have their own threshold of baseline practice and are linked to one another. To avoid negligence, employers must meet the baseline duty of care practice in each one of the steps (cf. figure 3).

**Figure 3. Duty of Care Integrated Risk Management Model©**



Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                                    001210
Plaintiffs Disclosures

# PLAN
## Step 1: Assess Risk

*NGO's and the energy, mining and infrastructure industry tend to send people to "bottom 60" countries.*[11]

While things do happen when employees travel, risk is all about being able to predict the probability of occurring. Therefore, customary travel patterns of employees of a company are a good indicator of the probability of certain risks to occur. Organizations tend to have a travel profile based on the types of places where their employees customarily travel to and operate around the world.

This first duty of care step involves the assessment of the specific health, safety, and security risks in the different locations where employees and contractors travel on behalf of the company. This allows the employer to get a better understanding of the risks in areas where they commonly travel and the associated duty of care obligations with regard to overall risk mitigation.

## Assessing Travel Risk for Locations Where ICTJ Operates

ICTJ has central offices in New York City (HQ), maintains offices in The Hague and Brussels, and has local teams (and offices) working with staff and partners in Colombia, Côte d'Ivoire, the Democratic Republic of the Congo, Kenya, Lebanon, Nepal, Tunisia, and Uganda. ICTJ also works in many other countries (but don't have offices) in Syria, Bosnia and Herzegovina, El Salvador, Guatemala, Libya, Mali, Myanmar, Philippines, Sri Lanka, South Africa, South Sudan, Turkey, and Ukraine.[12] It is logical that most ICTJ employee travel occurs between these locations/countries where ICTJ operates (especially with local offices) and to and from NY's main seat of operations.

As an international NGO, ICTJ operates largely in "dangerous countries" from both a medical and security risk perspective. Based on the security and medical risk maps, the countries where ICTJ operates (outside of the U.S. and Europe) are considered "high" or "extreme" medical risk according to the Health Risk Map developed by International SOS. Medical risk ratings provide an overview of the threats of infectious disease, hygiene and sanitation, accidents and the availability and quality of the local health infrastructure. The Health Risk Map updated annually (cf. appendix 1 for a 2016 medical risk map) helps organizations such as multinational companies, NGOs, educational institutions, and governments identify how to anticipate health threats to their employees using color-coded ratings of low, medium, high, extreme and large rapidly developing countries.[13]

Côte d'Ivoire, where ICTJ has an office location and the travel destination of Himzir Ziga, is rated as having "extreme" medical risk due to the high probability of contracting diseases such as yellow fever and malaria.

---

[11] Claus, L. and Giordano, E. (2013). Global employer duty of care: Protecting the health, safety, security and well-being of employees crossing borders.  Pp. 279-299 in Claus. L. (ed.), *Global HR Practitioner Handbook*. Silverton, OR: Global Immersion Press.

[12] https://www.ictj.org/about

[13] 13 https://www.internationalsos.com/newsroom/news-releases/health-risk-map-2015-c--signs-of-improving-private-healthcare-in-africa-jan-26-2015

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Even if the travel risk of a host country is low or moderate (New York, Brussels and The Hague belong to these lower medical risk countries), a risk assessment prior to departure is always required to ensure that the risk level has not changed and because of the unfamiliar environment of the country to the travelers. Business travelers are exposed to increasing health, safety, and security risks as they leave their home country and find themselves in unfamiliar surroundings. The unfamiliar environment encountered by the traveling person usually poses the greatest risk.[14]

Aware of the potential need for medical care while traveling, ICTJ provides a travel medical insurance policy (supplemental to primary medical coverage) for their domestic and international staff traveling on behalf of ICTJ. However, the policy for international staff is not automatic (for cost containment reasons) and requires the employee to opt-in each time prior to travel and coverage must be requested in advance of travel by the HR in NY (ICTJ 000408).

Baseline duty of care practice requires that employers: (1) analyze their travel data to identify common travel patterns and security/medical risks; and (2) assess "foreseeable risk" prior to each departure and make a travel authorization decision based on the assessed risk. Best practice is to supplement the risk assessment with a person-(traveler) location risk assessment and the kind of work done and activities engaged in while abroad (explained in step 4: Manage global mobility).

**Location Risk Assessment for ICTJ**

(1)  Analyze their travel data to identify common travel patterns and security/medical risks

It is highly unlikely that ICTJ followed the practice (usually done by employers who have frequent employee travel) of annually analyzing the travel patterns of their employees to identify the associated security and medical risks resulting from the mobility of their employees. I base this evaluation on the fact that there is evidence that ICTJ allows, and even recommends, that their employees book their "fixed" company travel on line, ICTJ avoids using a TMC for employee travel due to the higher cost and ICTJ doesn't seem to have a travel assistance vendor partner for international staff members. As a result, ICTJ have no formal tracking system in place and a large portion of their employee travel falls under their radar screen (expect for expense reimbursement). ICTJ has internal company data to conduct such an annual analysis of their travel patterns through the travel authorization and travel expenses processes. But compiling and analyzing this data would be onerous and more expensive than the use of a TMC.

(2)  Assess "foreseeable" risk prior to each departure and make a travel authorization decision based on the assessed risk

It is highly likely (and we have no evidence to the contrary) that ICJT did NOT conduct a formal assessment of foreseeable risks during an extended business trip and/or prepare a risk mitigation plan for anyone of its employees traveling with a certain frequency to its offices in Abidjan, Côte D'Ivoire (including Hitmzir Ziga). I base this evaluation on the following:

---

[14] Claus, L. *Duty of Care of Employers for Protecting International Assignees, their Dependents, and International Business Travelers.* White Paper, London: AEA International Pte. Ltd., 2009
Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001212
Plaintiffs Disclosures

Had ICTJ conducted such a risk assessment prior to Himzir Ziga's departure, they would have known the following information related to the medical risk of a business traveler to Côte D'Ivoire and the probability of contracting malaria if the standard duty of care protocol was ignored:

> Côte D'Ivoire is currently a level 2 risk country with a U.S. State Department warning of "*Exercise Increased Caution*."[15] The travel advisory also states that "*Travelers are reminded that they must have a yellow WHO booklet bearing a valid stamp for yellow fever inoculation or risk being denied entry into Côte d'Ivoire until an inoculation can be administered*" and that "*Appropriate malaria prophylaxis is also strongly recommended.*"[16] The CDC offers additional information on vaccines and health guidance for Côte D'Ivoire: "*You will need to take prescription medicine before, during, and after your trip to prevent malaria. Your doctor can help you decide which medicine is right for you*" and also talk to you about other steps you can take to prevent malaria.[17] More detailed information about Côte D'Ivoire indicates that malaria areas are "*all*" over the country (including Abidjan); that the estimated relative risk of malaria for US travelers is "*high*" and that "*chemoprophylaxis is recommended.*"[18]

Had a risk assessment been done prior Himzir Ziga's trip to Abidjan, Côte D'Ivoire, the various secondary government sources would have revealed that the probability of contracting malaria is high as a "foreseeable" risk. With a risk assessment prior to departure, ICTJ should have known about the following foreseeable risks related to malaria:

- Côte D'Ivoire is a malaria-endemic country.
- Employee travel to Côte D'Ivoire should trigger a medical risk alert.
- There is a generally accepted protocol in place to prevent and treat malaria that requires compliance before, during and after the trip.
- ICTJ must ensure that the common malaria protocol is followed.
- Employees do not always act rationally in their decision to comply with protocol.
- Education and training (especially symptom recognition) is extremely important.

Moreover ICTJ was presumably aware of malaria risk in Côte D'Ivoire since they reimbursed Himzir Ziga for a visit to the travel clinic in Brussels (ICTJ 000650) and for travel-related medication on February 10, 2014 (ICTJ 000649). Since the visit was done and the prescription filled on 2/10/2014 (the date on the receipts is 10-2-2014 as Belgium uses the day/month rather than month/day in the US), it was for a previous trip to Côte D'Ivoire according to the request for visa planned between February 23 and 28, 2014 (ICTJ 000647), and/or a trip from July 7-18, 2014 (ITCJ 000646) but not for the November 2015 trip.

Risk assessment prior to departure is a fundamental duty of care obligation. In assessing how well ICTJ met the full scope of its duty of are obligations with regard to "foreseeable" risk assessment of Himir Ziga's 2015 trip to Côte D'Ivoire, it is worthwhile to explore the following questions for which ICTJ provided no or limited evidence to the plaintiff:

[15] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/cote-d-ivoire-travel-advisory.html
[16] https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=21517
[17] https://wwwnc.cdc.gov/travel/destinations/traveler/none/ivory-coast
[18] https://wwwnc.cdc.gov/travel/yellowbook/2018/infectious-diseases-related-to-travel/yellow-fever-malaria-information-by-country/ivory-coast#seldyfm879

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

<u>Did ICTJ formally assess the risk of Himzir Ziga's 2015 business trip to Abidjan, Côte D'Ivoire prior to his departure?</u>

Although there is an evidentiary gap to assess whether ICTJ conducted a risk assessment at any time for travel to Côte D'Ivoire and more importantly prior to Himzir Ziga's 2015 departure, based on a reconstructed timeline and the existing travel policy it is highly unlikely that they did so.

<u>What risk assessment sources were used (secondary government and/or private sources) and what would ICTJ have learned from these sources in terms of foreseeable risk?</u>

In the absence of using a travel management or travel assistance vendor, ICTJ would rely on secondary sources for an eventual risk assessment. Even secondary government sources, generally more generic than those from private travel assistance companies, would have highlighted the "high" to "extreme" risk of Himzir Ziga contracting malaria unless a standard malaria protocol was followed.

<u>Who was in charge at ICTJ (i.e. which department or organizational structure) for approving Himzir Ziga's travel to Côte D'Ivoire?</u>

Although ICTJ has a required travel authorization process (and form) in place, I did not see the travel authorization document, who signed it and when. This document would tell us whether the trip was authorized according to their policy; if there was enough time between the travel authorization and the actual travel for Himzir Ziga to see a doctor, receive a prescription for prophylactic malaria medication, and had enough time to take the medicine prior to departure.

<u>Were there any medical/security alerts in place that would impact Himzir Ziga's trip approval process (as a result of the risk assessment)?</u>

The high foreseeable risk of malaria in Côte D'Ivoire should have triggered a medical alert and subsequent communication of the risks, training and normative behavioral guidelines for Himzir Ziga (i.e. get a medical visit, take prescribed medication, get education and training on the symptoms, etc.).

The practice recommended by ICTJ to prefer online booking for trips that have a fixed itinerary; the reluctance to use a TMC for travel booking; the absence of an assistance vendor for travel tracking and medical assistance likely resulted in a failure of ICTJ to get and act upon a medical alert prior to Himzir Ziga's trip to Côte D'Ivoire (and presumably also the people accompanying him).

<u>What risk mitigation precautions were put in place for the major risk of malaria?</u>

We have no evidence trail that Himzir Ziga had a medical visit, prescribed medication, and was made aware of the risks, had a right to refuse the travel, and that he and his supervisor (Santa Falasca) received malaria ABCD awareness education prior to his business trip to Côte D'Ivoire.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)            001214
Plaintiffs Disclosures

**Conclusions of Step 1 Audit: Assess Risk**

ICTJ did not meet the duty of care baseline in step 1 by failing to conduct a formal assessment of foreseeable travel risks of its employees.

- ICTJ likely failed to conduct a formal assessment of the foreseeable travel risk to Côte D'Ivoire prior to Himzir Ziga's departure (and likely including the other employees and contractors traveling with him).
- Had ICTJ done a basic risk assessment prior to departure, it would have revealed the high foreseeable risks of malaria for business travelers to Côte D'Ivoire.
- There is no evidence that there was a formal travel authorization of Himzir Ziga's trip as required by ICTJ's stated travel policy.
- The absence of the use of travel management company (TMC) for travel booking and/or an assistance vendor for travel tracking and medical assistance also likely resulted in not getting a medical alert of the risks of traveling to a malaria-endemic country prior to Himzir Ziga's travel.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001215
Plaintiffs Disclosures

**PLAN**
**Step 2: Plan Strategically**

This step involves the development of an integrated risk management strategy, including both an incident management plan, and an ongoing duty of care process so that ICTJ as an NGO can effectively and efficiently assume its duty of care obligations.

Baseline strategic planning involves planning and setting up the administrative structure to support the execution of the plan. With regard to duty of care planning, it involves both an ongoing duty of care planning process (how to assess and prevent/mitigate risk related to international travel) and an incident management plan (in case of incidents or crises). The infrastructure to support the strategic duty of care planning involves having designated decision-makers, policies and procedures, approval processes, the identification of a designated crisis management team, and communication with and education/training of the stakeholders of the requirements of the duty of care plans.

**ICTJ as an Integrated Enterprise**

Based on the integrated enterprise test (whether two or more units of an enterprise are considered a single employer), the Brussels' office of ICTJ is controlled by the U.S. entity in NY. To determine whether ICTJ is a single employer, the test has four factors[19]:

1. *Interrelation of operations*: Very obvious from the content of the ICTJ website.
2. *Common management*: Himzir Ziga reports to supervisor Santa Falasca but also has a professional line of authority in NY and takes orders from HQ.
3. *Centralized control of labor relations*: Employee handbook and travel policies are drafted and controlled from the NY (HR) office.
4. *Common ownership or financial control*: Financial statements are consolidated.

As an integrated enterprise it is logical that ICTJ's strategic planning for duty of care (i.e., ongoing duty of care planning process and an incident management plan in case of crisis) is centralized and controlled in New York for all its worldwide offices—with some localization to comply with the laws of the countries in which they operate. To assess whether they met the baseline of strategic duty of care planning, I examined ICTJ's mission, Himzir Ziga's employment contract, the employee handbook, an incident management plan, and the availability of insurance (for both employer and employee) in case of a duty of care incident.

**ICTJ's Mission**

Taking into account good management practice, the duty of care initiatives of an employer should flow directly from the mission and strategic objectives of the organization: ICTJ *"works for justice in countries that have endured massive human rights abuses under repression and in conflict. We work with victims, civil*

---

[19] Claus, L. and Moritz, S. (2013). The legal context of global HR. Pp. 93-115 in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 1. Silverton, OR: Global Immersion Press.
https://www.repository.law.indiana.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=2157&context=ilj;

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

*society groups, national, and international organizations to ensure redress for victims and to help atrocities from happening again."* [20]

The lofty mission of ICTJ as an NGO as stated above for the victims of injustice, would logically apply to taking care of their internal workforce (employees and contractors) with the same zeal and resources. We also know that, generally, NGO employees are attracted to their employer because of the cause that they serve. We have evidence that Himzir Ziga was very loyal to the cause of ICTJ as expressed by both his family and ICTJ colleagues after his death. David Tolbert and Paul Seils in their remembrance of Himzig Ziga mentioned his loyalty:

- *"He was also committed to doing what he could to address human rights abuses across the global and was indeed deeply committed to ICTJ and its mission."* (ICTJ 000947).
- *"...he was happy to work for a cause."* (ICTJ 000948).

## Himzir Ziga's Job Announcement

The job announcement (ICTJ 000114) includes the responsibility of the finance officer to *"supervise the financial management of the EU grants"* and *"coordinate audits for the Brussels office and field offices"* and does not mention any travel requirements as part of the job to fulfil these essential functions.

## Himzir Ziga's Employment Contracts

ICTJ Travel & Expenditure Policy New York and International states *"international travel is a central facet of the work of ICTJ."* (ICTJ 000361). Yet, Himzir Ziga's (2013 and 2014) employment contracts do not mention "travel" as an essential function of his job responsibilities.

The 2013 contract of limited duration (ICTJ 000001-000003) includes the financial management and supervision of EU projects (article 1a) as his job responsibilities. The 2014 contract of indefinite duration (ICTJ 000004-000006; ICTJ 000001) refers to the financial management of EU projects and support of the teams on the field and supervision of the financial and administrative management of the CDI office.

There is evidence that during Himzir Ziga's employment (under both contracts) he traveled in Europe, the U.S. and Africa. For example in 2015 alone, Himzir Zigi's expense reimbursement reports indicate that he traveled to Den Hague, Netherlands, Berlin, Germany and obviously Côte D'Ivoire, Africa. In 2013, he traveled to the U.S. (9/8/13 to 9/13/13 ICTJ 000924-946). In 2014, he went to Côte D'Ivoire, Africa on two occasions: February 23-28, 2014 (ICTJ 000649) and July 6-18, 2014 (ICTJ 000649-000650; ICTJ 000646). Based on the limited amount of available expense reports, the number of trips and the destinations to which he was required to travel each year for auditing projects (U.S., Europe, and Africa) may have constituted as much as 10% of his job responsibilities. Therefore, travel should have been listed as a job requirement so that Himzir Ziga would have known the travel expectations of his employer when he signed the employment contract.

---

[20] https://www.ictj.org/about

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001217
Plaintiffs Disclosures

**ICTJ's Employee Handbook**

ICTJ's Employee Handbook has sections applying to U.S. employees only and other sections for all employees (U.S. and international). The handbook does not mention common policies, procedures, and processes related to duty of care.

It should be noted that the Employee Handbook of 4/15/2014 has an appendix 4, p. 47 that refers to Travel Expense Reimbursement. However, it is left blank with the mention "TBD" meaning to be determined (ICTJ 000169; ICTJ 000223; ICTJ 000273; ICTJ 000331). Presumably that is the case because ICTJ has a separate Travel & Expenditure Policy.

**ICTJ's Travel & Expenditure Policy New York and International**

Covered in greater detail under step 3.

**ICTJ Duty of Care Strategic Planning**

In assessing duty of care, it is customary to classify employers in terms of where they are on the duty of care continuum using a color-coded (red, blue and green) system (cf. figure 2). Many companies still fall within the duty of care "red zone" where they are at risk. They are either unaware or—erroneously---believe that the risks out there are minimal and that it won't happen to them. Other companies—usually after they have experienced an incident—are very compliance focused and take a safety-net approach. They fall in the "blue zone." The remainder of companies view their duty of care obligations as the "right thing to do—to take care of their employees" as they hold strong ethos in this area. In addition to helping the community where a company operates, CSR is about caring for the community within—the employees, families and partners who make up the core of their company. They are in the "green zone" on the duty of care continuum.

**Figure 2. The Duty of Care Continuum in Organizations**



There is no evidence that leadership at ICTJ developed and implemented an integrated risk management duty of care strategy for their international travel in its various worldwide locations. If this baseline practice would have been followed by ICTJ, it would have resulted in a comprehensive set of duty of care policies, an ongoing management plan, an incident management plan, scenario planning for various risks and a designated duty of care team that can response 24/7 to incidents. Due to the nature (NGO) and size (relatively small number of employees) of ICTJ, such strategic

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)
Plaintiffs Disclosures

001218

planning would likely have been done with strategic partners (duty of care vendors). While one could argue that ICTJ is a relatively small company in terms of number of employees, yet according to its financial statements it has substantial sources of revenue. ICTJ admits and states that international travel is *"a central facet"* of their work. Combined with a likely pattern of travel to dangerous locations (common to international NGOs and congruent with their international office locations), ICTJ should make the duty of care costs needed to protect their traveling employees part of the grant budget. The absence of a strategic duty of care plan likely contributed to Himzir Ziga's contraction and death from malaria.

**ICTJ's Incident Management Plan**

To date, there has been no evidence produced showing that ICTJ had any operational and/or incident management plans for Himzir Ziga's regular travel to a high-risk country such as Côte D'Ivoire, or for that matter for other traveling employees despite the high risk of their employee travel profile.

Based on ICTJ's Employee Handbook and Travel & Expenditure Policy New York and International (despite the many evidentiary gaps), it is fair to conclude that at the time of the incident (in 2014-2015), ICTJ was operating in the red zone on the duty of care continuum. Based on the revisions of its travel policy and the subsequent use of a dedicated TMC (ICTJ 000598-000603 they are now –after the death of Himzir Ziga and the filing of a lawsuit for allegedly breaching their duty of care obligation (000958)—likely operating in the blue zone.

Had ICTJ conducted a general risk assessment of the locations in which they operate (cf. step one), they would have been able to develop risk mitigation plans based on scenario planning. Due to the frequent travel of their workers (employees and contractors) to their office in Côte D'Ivoire and other malaria-endemic countries, the prevention and treatment of malaria would have been a logical candidate for the development of a scenario plan including:

- A protocol for traveling to a malaria-endemic country (readily available from CDC, WHO, etc. as elaborated on above).
- The existence of a medical alert for any employee (such as Himir Ziga) traveling on behalf of the ITJ to a malaria-endemic county.
- Education and training of employees traveling to malaria-endemic countries using the ABCD model.
- Sourcing of appropriate medical providers before, during and after employee travel to prevent and treat malaria.
- Training for supervisors (including Santa Falasca and the HR department) and others authorizing travel to a malaria-endemic country).

**Insurance**

ICTJ has two travel-related insurances: (1) a travel accident and emergency evacuation insurance through Zurich (for NY employees only); and (2) a medical insurance through AIG.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University


Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001219
Plaintiffs Disclosures

1.  ICTJ is a Travel Guard AIG Policy holder No. WS11008699 issues on 05/26/2015 (ICTJ 000007-000112) which includes:
    - Foreign business auto liability and physical damage coverage
    - Foreign voluntary compensation and employers liability insurance coverage

2.  ICTJ provides supplemental medical insurance coverage to domestic and international staff traveling on behalf of ICTJ. In the case of Himzir Ziga, the AIG medical travel policy (effective 12/1/08) covers international staff traveling to the U.S. or internationally (ICTJ 000599). The premiums are very low and based on travel dates: "*It is the Program Assistant's responsibility to email the HR Manager with the request for supplemental medical coverage along with a copy of traveler's confirmed flight itinerary.*" (ICTJ 000600). The opt-in oportunity for this insurance is part of the Travel Request Form with a supplemental email to Sharlene (?)

The opt-in nature of the medical insurance requires additional action of the traveling employee, the program manager and HR. This procedure is in place for obvious cost containment reasons as ICTJ (the employer) is paying the insurance premiums. In such an opt-in insurance system, the traveler must complete the travel authorization form, and the program assistant and HR manager have to take timely action to enroll the traveler in the insurance. The program assistant must notify HR, and the HR manager must administer the enrollment process online. All these opt-in rather than automatic enrollment steps reduce the probability (due to possible human omission) that the ICTJ's international staff member traveling has no medical insurance protection while abroad. We have evidence that in Himzir Ziga's case the medical insurance enrollment was completed as his heirs upon his death received a payout from AIG [ICTJ 000007-000112].

While insurance is prudent and highly recommended for any organization—especially with international travelers—it is not a substitute for the employer meeting their duty of care obligations.

**Conclusions of Step 2 Audit: Plan Strategically**
ICTJ did not meet the duty of care baseline in step 2 by failing to develop strategic and operational duty of care plans.
- Himzir Ziga's employment contracts did not mention travel as an essential function of his job responsibilities.
- There is no evidence that leadership at ICTJ developed and implemented an integrated risk duty of care strategy for international staff travel in its various worldwide locations.
- There is no evidence that ICTJ had any operational and/or incident management plans for Himzir Ziga's regular travel to a high-risk country such as Côte D'Ivoire, or for other traveling employees despite the probable security and medical risk encountered by their employees and contractors based on their international travel profile to dangerous countries.
- ICTJ has an opt-in medical insurance coverage for the travel of its international staff rather than automatic enrollment.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

## PLAN
### Step 3: Develop Policies and Procedures

This step involves the development of a clear set of duty of care policies that govern employees who are traveling on behalf of the company, both short- and long-term, and assisting employees in keeping them healthy, safe and secure.

It is customary for employers to have a variety of duty are policies under the travel management umbrella. Some duty of care policies are even more relevant for international NGOs as their employees travel to more dangerous countries and locations (see * next to policy type). Figure 3 describes the common duty of care policies (description), applies them to the ICTJ and evaluates their effectiveness.

**Figure 3. Common Duty of Care Policies**

| Policy type | Description | ICTJ's travel policies | Evaluation |
|---|---|---|---|
| *Travel management policy AKA transportation and travel accommodation policy | Details how employees book transportation and accommodation for their travel (mainly air and hotel but now also includes travel and accommodation gig economy vendors), which travel vendors are approved for use, and the travel approval process. Note: travel authorization can be a separate policy or falls under the umbrella of the travel management policy. | ▪ *"ICTJ will maintain ICTJ accredited travel broker vendor(s) list. Travel booked via other means such as Orbitz.com, Kayak.com, Travelocity.com, or other online site or other vendor when the vendor(s) is not able to provide the service or the cost is minimum 10% less than all the ICTJ accredited travel brokers."* (ICTJ 000363, rev. 12/9; 000381, rev. 4/15). <br>▪ *ICTJ staff should book flights, hotel, train, etc. directly via the internet <u>only</u> when travel plans are guaranteed not to change or in emergency.* (ICTJ 000363, rev. 12/09; ICTJ 000381, rev. 4/15) <br>▪ *"International staff is* | ICTJ's travel management policy is called: *ICTJ Travel & Expenditure Policy New York and International.* Heavy focus on cost containment and control at the expense of duty of care. |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

| | | | |
|---|---|---|---|
| | | *encouraged to develop relationships with travel agencies specializing in travel in their region in an effort to obtain the most cost-effective arrangements, which can most often be made locally."* (ICTJ 000373, rev.4/15; ICTJ 000391, rev. 5/15; ICTJ 000409, rev. 10/15) | |
| *Travel approval/ authorization | A policy requiring travel authorization or approval from a designed person or manager prior to departure. | ▪ *"It is also important for security, insurance and other institutional purposes that designated staff members are aware of travel plans, that all paperwork is completed prior to travel and that all travel has received the proper levels of approval."* (ICTJ 000345, rev. 12/09)<br>▪ *"Traveler: must obtain pre-approval from their supervisor and the relevant grant manager prior to approval."* (ICTJ 000360, rev. 12/09; ICTJ 000360, rev. 4/15).<br>▪ *"Travel should be planned at least 14 days in advance."* (ICTJ 000361, rev. 4/15; ICTJ 000379, rev. 4/15).<br>▪ Staff is encouraged to book online travel rather than through a travel agency for fixed | ICTJ has a travel management authorization form.<br>The completed form for Himzir ziga's travel has not been provided to the plaintiff by ICTJ. |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001222
Plaintiffs Disclosures

| | | itineraries to minimize travel costs (ICTJ 000345-000346). | |
|---|---|---|---|
| *Security alert policy | A system to trigger an alert when an employee is booking travel to a country with high or extreme security risk and which protection protocol should be followed. | *"Have you submitted your security plan to your supervisor, HR and other relevant individuals as identified by your program?"* (ICTJ 000353, rev.12/09; ICTJ 000374, rev. 4/15) | There is a security risk flag on the travel authorization form allowing for a security alert. |
| *Medical alert policy | A system to trigger an alert when an employee is booking travel to a country with "high" or "extreme" medical risk and which protection protocol should be followed. | Not able to determine medical risk alert from ICTJ's *Travel & Expenditure Policy New York and International.* | There is no medical risk flag on the travel authorization form. ICTJ encourages online travel booking for cost containment reasons. TMCs have a common practice to alert the travel booker of medical travel risk. Since Himzir Ziga booked his ticket on line and no TCM was used for cost containment reasons, it is likely that there was no medical risk alert for his trip to Côte D'Ivoire. |
| *Travel tracking policy | A system to track traveling employees so that employers can locate employees, advise them of changing risk and assist them if needed. | No evidence that ICTJ is tracking employees traveling on their behalf. | Since Himzir Ziga was traveling to one of the organization's field offices, it is safe to assume that his local colleagues know his whereabouts during work hours. |
| *Travel insurance policy | Details the types of insurance protection the employer has for traveling employees (medical, evacuation, | There is a medical coverage policy through AIG for international staff traveling to the U.S. or internationally. | Payment of death benefits to Himzir Ziga's family is proof that he was enrolled in medical insurance prior to departure. |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

| | | | |
|---|---|---|---|
| | life, etc.) and whether is as an automatic enrollment (greater protection) or opt-in (less protection). | ICTJ has an opt-in medical travel insurance for it international staff. *"This policy is not automatic and coverage must be requested in advance of travel."* It is *"highly recommended to arrange prior to the trip through Sharlene."* (HR?) Part of ICTJ's pre-travel checklist is to *"contact HR to request travel medical coverage."* (ICTJ 000352-000353, rev. 12/09; ICTJ 000373, rev. 4/15) | |
| Travel expense reimbursement policy | Details the reimbursement protocol and controls in place for travel expenses. | *ICTJ Travel & Reimbursement Policy New York and International"* *"ICTJ will cover all vaccination and reasonable travel medicine and health supplies."* (ICTJ 000363, rev. 12/09; ICTJ 000363, rev. 4/15; ICTJ 000381, rev. 4/15). | ICTJ's travel management policy focuses heavily on cost containment and is more of a reimbursement policy than a travel policy. Evidence of a medical visit and/or medication reimbursement has not been provided for Himzir Ziga's 2015 trip to Côte D'Ivoire. |
| Required rest break policy | Details when rest breaks are required during travel, or which transportation means are (dis)allowed after lack of rest as a result of time zones. | Not able to determine from ICTJ's *Travel & Expenditure Policy New York and International.* | Not applicable in this case. |
| Remote worker duty of care policy | Details how the health, safety and security of those workers who work remote (or in co-working spaces) is ensured and checked. | Not able to determine from ICTJ's *Travel & Expenditure Policy New York and International.* | Not applicable in this case. |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

| | | | |
|---|---|---|---|
| *Prohibited employee risky behaviors policy | Details the prescribed and prohibited behaviors while on assignment or traveling in order to protect employee health, safety and security. May include prohibited behaviors such as extreme sport, alcohol and drug use, etc. and recommended preventive behaviors. | Employee Handbook: covers controlled substances and smoking. | ICTJ's Travel & Expenditure Policy New York and International: <br> ▪ Mentions alcohol consumption related to (no) expense reimbursement. <br> ▪ Does not mention a requirement for medical visits for obtaining appropriate vaccinations and other preventive medical protocols <br> ▪ No evidence of a protocol for employee traveling to a malaria-endemic country. |
| Bleisure personal travel | Details whether the employee is allowed to extend business travel for personal entertainment (at personal expense and liability.) | ICTJ's travel policy includes personal and family travel related to (no) expense reimbursement. | Not applicable in this case. |
| Family and companion travel | Details whether the employee is allowed to bring family and companions (at personal expense and liability). | ICTJ's travel policy includes personal and family travel related to (no) expense reimbursement. | Not applicable in this case. |
| *Refuse to travel | Details the employee's rights to refuse a risky travel assignment and the circumstances thereof. | Not able to determine from ICTJ's *Travel & Expenditure Policy New York and International.* <br><br> The absence of a right to refuse travel policy puts the employee in a disadvantageous situation. | Although per his employment contract, travel was not an essential function of his job, Himzir Ziga did not have an opportunity to refuse travel to Côte D'Ivoire. <br> Even if he would have wanted to refuse going on this trip, he may have been reluctant to do so as it was not available as an option in ICTJ's travel policy and for |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University


Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001225
Plaintiffs Disclosures

| | | | fear of the impact it may have on his career and/or employer retaliation as a result of refusing travel that had such an importance to ICTJ in terms of funding. |
|---|---|---|---|
| I'm Okay and other communication policies | Requires that employees communicate back to their employer during crisis/emergency situations indicating whether they are Okay—initiated by the employer both as a query for employee status and means of being able to provide assistance. | Not able to determine from ICTJ's *Travel & Expenditure Policy New York and International.* | The absence of such a policy likely did not impact Himzir Ziga as he was surrounded by experienced local co-workers in the Abidjan office who have the local knowledge and means to support him in case of emergency. |
| Risk waivers | Details whether the company has the employee sign risk waivers after having been informed of the travel risks. | Not able to determine from ICTJ's *Travel & Expenditure Policy New York and International.* | Risk waivers do not really hold up in court, but waivers are often a means used by employers to ensure that the employee is aware of the travel risks. |
| *Vendor/ contractor due diligence | Details the process by which vendors/contractors are audited in terms of how they assume duty of care responsibilities that may impact employees. | Not able to determine with the materials provided by the defendant. | May apply to the hotel Himzir Ziga stayed in while in Abidjan. Where did he stay? A local or international hotel? Since ICTJ is heavily focused on containing travel costs and the hotel reservations were made by the local Côte D'Ivoire office staff, it is possible that he was booked in a local hotel. Local hotels (compared to international ones), may not have the same standards for malaria |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

| | | | vector controls such insecticide-treated mosquito nets (ITNs) and indoor residual spraying (IRS). The location of the hotel (vis-à-vis the ICTJ office) and the means of transport provided are also relevant. We do not know whether during his stay Himzir Ziga had to walk to and from his hotel between dusk and dawn when mosquitoes are most active. |
|---|---|---|---|
| Data sharing | Details how private data related to personal employee health and travel are shared between duty of care vendors and the employer in case of emergency. | Not able to determine with the materials provided. | Not applicable in this case. |
| Privacy | Details how private data related to employee health and travel are protected. | Not able to determine with the materials provided. | Not applicable in this case. |

A review of ICTJ's Employee Handbook and Travel & Expenditure Policy New York and International reveals that:

- ICTJ's travel authorization process is prioritizes cost savings (budgetary matters) over employee protection.
- ICTJ's travel policies include limited attention to duty of care in terms of security for traveling employees but has no mention on medical risk.
- ICTJ's travel policies are almost exclusively focused on expenditure reimbursement.
- ICTJ's travel policies encourage employees to book travel online (when the itinerary is fixed and not likely to change) rather than using (more costly) TMCs.
- There is no evidence that ICTJ has medical and security alerts for high and extreme risk travel, especially to malaria-endemic countries.
- There is no evidence that ICTJ has a refuse to travel policy.
- There is no evidence that ICTJ urges employees to avoid risky behavior.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001227
Plaintiffs Disclosures

International NGOs who send their employees to bottom 60 countries generally have a more detailed and protective set of duty of care policies than other employers of similar size not operating internationally.

## Conclusions of Step 3 Audit: Develop Policies and Procedures

ICTJ did not meet the duty of care baseline in step 3 by focusing its travel management policies on cost control rather than on mitigating employee (medical) risk.

- ICTJ has limited travel policies compared to the baseline duty of care policies of other employers including NGOs.
- ICTJ's travel policy has a strong cost containment focus with the aim of minimizing travel costs.
- ICTJ's travel policy is more of an expenditure policy than an employer duty of care/employee protection policy.
- ICTJ staff is encouraged to book travel online for trips that are unlikely to change rather than using a TCM.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001228
Plaintiffs Disclosures

# DO
## Step 4: Manage Mobility

This step involves a review of how an employer oversees the specific international mobility of its employees crossing borders on their behalf as business travelers or international assignees.

Baseline practices include:
- Authorize the trip, complete and sign all documents.
- Conduct an initial travel risk assessment prior to employee departure.
- Conduct ongoing/changing risk assessment while employee travels (after the initial one).
- Have two-way communication protocols in place.
- Support the traveler in mitigating risk.
- Ensure that employees are trained.
- Track travelers and inform them of changing risks.
- Manage any travel incident in an effective and timely manner.

Due to evidentiary gaps, it was difficult to evaluate to what extent ICTJ adhered to this baseline duty in managing Himzir Ziga's mobility during his business trip to Côte D'Ivoire.

### Authorize the trip, complete and sign all documents

The documentation provided does not include a copy of the dated travel authorization for Himzir Ziga's's business trip to Côte D'Ivoire. The travel authorization would show whether ICTJ adhered to its own travel management policies, i.e., not allowing employee travel without a travel authorization (ICTJ 0003339-411). It would also fill important gaps in the timeline of events, i.e., whether there was sufficient time between the travel authorization and Himzir Ziga's departure to Côte D'Ivoire to allow him to get a medical visit and provide sufficient time for him to take the prophylactic malaria medication (per the standard malaria protocol) before his departure.

### Conduct an initial travel risk assessment prior to employee departure

We have no evidence that ICTJ assessed the risks of staff traveling to Côte D'Ivoire. Had even a very basic risk assessment been done prior to Himzir Ziga's trip, it would have revealed the "extreme" risk of malaria (cf. pages 13-18,  Location risk assessment for case) and the common standard malaria risk mitigation protocol (cf. pages 9-12,  Standard recommended malaria duty of care protocol for employers)

### Conduct ongoing/changing risk assessment (after the initial one)

While conducting ongoing risk assessment to ascertain changing risk is a basic duty of care step in managing the mobility of a traveling employee, the fact that Himzir Ziga traveled to a local ICTJ office (staffed with locals), puts the onus of co-responsibility for duty of care on the local ICTJ Côte D'Ivoire staff, especially Mohamed Suma (management) and Virginie Ehoule Manzan Amichia (making local travel arrangements). The local (Abidjan) ICTJ staff are very much aware of the risk of

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University


Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001229
Plaintiffs Disclosures

contracting malaria (especially for "foreign" visitors), preventive measures to be taken and symptoms of the disease and, hence, play a major role as ICTJ agents in mitigating risk.

**Have the communication protocols in place**

Communication protocols must be in place so that a duty of care incident can be managed by all concerned in the most effective way, possibly reducing the negative outcomes of the incident.

Himzir Ziga experienced symptoms of ill health (fitting the malaria diagnosis) shortly upon his return to Brussels. The exact date is not clear on the reconstructed timeline but he became ill sometime between 12/5/15 and 12/14/15. We are not sure whether he shows up for work on Monday 12/5/15 or any day that week or whether he calls in sick.

But we know that sometime in that time frame, Himzir Ziga communicates with his supervisor Santa Falasca about his symptoms and that she encourages him to go and see a physician. Himzir Ziga visits a general practitioner (not sure of the date and/or whether the GP is Dr. Leslie Mathonet) who treats him with ibuprofen for the flu. On 12/15/15, Himzir Ziga obtains from Dr. Mathonet the required certificate of incapacity to work for a period of 5 days (from 12/14/15 to 12/18/15).

There are many evidentiary gaps in the exact timeline in the unfolding of these events. What is evident is that Santa Falasca knew that Himzir Ziga had symptoms, just returned from Côte D'Ivoire, and that she sent him to a general practitioner. Santa Falasca negligence is two-fold: She either was not aware of malaria symptoms and/or she failed to send Himzir Ziga to an infectious disease specialist.

- Santa Falasca should have gained such malaria awareness through education and training provided by ICTJ headquarters as part of her supervisory training and management responsibility of frequently sending staff and contractors to Côte D'Ivoire—a malaria-endemic country. Had she been aware of malaria symptoms (similar to those exhibited by Himzir Ziga upon his return), she would have known the seriousness of such symptoms, the urgency of treatment, and not sent Himzir Ziga to a general practitioner but to a specialist in infectious diseases.

- Having lived and worked in Brussels since at least 2002 (for the European Commission and ICTJ), Santa Falasca should have known of the medical services of the Institute of Tropical Medicine (Antwerp, Belgium),[21] a world renowned and household name in Belgium (especially by professionals like herself with an established career in international governmental and non-governmental organizations. The Institute of Tropical Medicine would have referred Himzir Ziga to be examined either by an appropriate referral doctor in Brussel and/or likely admitted him in their own hospital in nearby Antwerp.

---

[21] https://www.itg.be/E/medical-services

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001230
Plaintiffs Disclosures

**Support the traveler in mitigating the risk**

As the summary of malaria prevention cost per person for an employer shows, the average cost for ICTJ to support Himzir Ziga in mitigating malaria risk and preventing his death would have ranged from $500 to $800.

- Pre-departure medical visit: $300-$500.
- Malaria Prophylaxis – Malarone: $ 150; Doxycycline - $20 - $130
- Cost of vector control items: $10-$25 pp (less if bought in bulk)
- Cost of a Rapid Diagnostic Test (RDT) for the employee: $35 - $60 pp (average cost)

These costs reflect U.S. 2018 prices, vary depending on country of origin where services are rendered and whether the medication and supplies are obtained at or below costs. Medical insurance coverage is usually available for parts or all of this malaria prevention protocol. ICTJ failed to take these relatively inexpensive preventive measures to support Himzir Ziga.

**Ensure that people are trained**

Baseline duty of care practice requires that employees traveling on behalf of their company (as well as their supervisors/managers) receive the proper communication, education and training prior to departure and that proper communication channels are established between the employer and the employee throughout the trip (cf. step 5 for more details).

**Track travelers and inform**

Baseline duty of care practice requires that employees traveling on behalf of their company are tracked at all times (cf. step 6 for more details).

**Manage the incident in an effective and timely manner**

Baseline duty of care practice requires that employers have the plans, tools and people in place to manage a duty of care incident when it happens (see step 7 for more details).

**Conclusions of Step 4 Audit: Manage Mobility**

ICTJ did not meet the duty of care baseline in step 4 by failing to appropriately manage HimZir Ziga's business trip to (and from) Côte D'Ivoire (I come to this conclusion based on the available materials available to me in spite of evidentiary gaps in the management of Himzir Ziga's mobility.

- A copy of Himzir Ziga's travel authorization and other documents (such as ICTJ company emails) would allow for a more precise timeline of events.
- Himzir Ziga's travel to a company-owned office abroad, puts the co-responsibility for duty of care on the local ICTJ Côte D'Ivoire staff as they are very much aware of the risk of foreign travelers contracting malaria.
- ICTJ failed to take relatively inexpensive preventive measures (an average of $500-$800 per person) to prevent Himzir Ziga from contracting malaria.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

- Santa Falasca (Himzir Ziga's direct supervisor) contributed to ICTJ's negligence by knowing Himzir Ziga had symptoms after he returned from his business trip to Côte D'Ivoire and by sending him to a general practitioner rather than an infectious disease specialist.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

**DO**
## Step 5: Communicate, Educate, and Train

This step involves the required communication, education and training to ensure that the risk management strategy, including policies and procedures, are appropriately communicated and that employees (and their supervisor/managers) are aware and appropriately prepared for the foreseeable risks before they leave.

### Communication

- No evidence has been presented that ICTJ (either in NY or Brussels) communicated to Himzir Ziga, prior to his departure, the extreme medical risks traveling to a malaria-endemic like Côte D'Ivoire and the preventive measures to be taken. Although Himzir Ziga had been to Côte D'Ivoire before (in 2013) and at that time may (or may not) have been made aware of malaria risk by ICTJ, it is always the employer's duty to warn the employee of the risks prior to each trip and not to assume that the employee's past experience is sufficient.
- There was likely no specific communication protocol (based on malaria scenario planning) in place in case of an incident/emergency (see step 6 for further details).

### Education and training

Except for general ICTJ onboarding, Himzir Ziga did likely not receive any education and training to prevent and/or treat malaria or any other infectious diseases. There is no evidence that Santa Falasca was educated and trained in the ABCD of malaria by ICTJ headquarters even though she has management responsibility for frequently sending staff and contractors to Côte D'Ivoire—a malaria-endemic country.

### Conclusions of Step 5 Audit: Communicate, Educate, and Train

ICTJ did not meet the duty of care baseline in step 5 by failing to provide duty of care awareness, education and training on how mitigate the foreseeable risk of malaria prior to Himzir Ziga's business travel to Côte D'Ivoire.

- There is no evidence that Himzir Ziga was educated and trained by ICTJ on the ABCD of malaria prior to departure.
- There is no evidence that Santa Falasca was educated and trained by ICTJ on the ABCD of malaria as Himzir Ziga's supervisor.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001233
Plaintiffs Disclosures

# DO
## Step 6: Track and Inform

This step involves tracking travelers (know where travelers are at any given time), the ability to communicate with them if a situation changes or in the event of an emergency. It also identifies the key spokespersons in the organization who will communicate with both internal and external stakeholders during an incident or crisis. Duty of care baseline practice consists of establishing a communication protocol with the traveling employee prior to departure and establishing a two-way means of communication in case of emergency. The communication protocol usually consists of designated contact people in case of emergency.

For international employers this task is often contracted to duty of care vendors partnering with the employer in ensuring duty of care. The vendors are available 24/7, trained in protocols for different types of emergencies based on planning of likely scenarios determined by the risk associated with the employer's travel profile. When traveling, employees usually contact the designated vendors directly for health, safety and security issues. The partner vendors also target messages to the field either on a regular basis or through an emergency notification system.

### Tracking

There is no evidence that ICTJ tracks its employees while they are traveling domestically or abroad. It is highly unlikely that they do because they do not recommend the use of a TCM. While airline tickets booked through approved TMCs are often 10 to 30% more expense than direct online booking, TCMs provide other valuable services that justify the additional travel expense to employers. The most important duty of care service they provide is that they trigger medical and security alerts, often send educational messages about the country-specific travel risk to the employee, and automatically track traveling employees. Corporate travel business organizations are very much aware of the employer's duty of care obligations and they consider tracking and informing business travelers a value-added service to their clients (employers and business travelers). There is also no evidence that ICTJ uses any kind of other assistance vendors (medical assistance company, security assistance company, expense tracking company, etc.) to track, inform and assist the traveling employee.

Himzir Ziga booked his ticket directly on line and not via an approved TMC. To the best of my knowledge, he had no contact with any type of medical assistance vendor that ICTJ partners with for employee travel. In Himzir Ziga's situation, his travel tracking is by default through his work presence at the local ICTJ Abidjan office. As a result, during working hours his whereabouts were known by ICTJ.

### Informing

Since ICTJ did likely not use the services of an assistance vendor to inform Himzir Ziga of changing risks while traveling, or to assist him with medical issues as a result of his travel, when on location in Côte D'Ivoire, most of his medical risk information would likely have come for the local Abidjan staff.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

This would or could likely have been done by the local staff through informal communication regarding the importance of malaria awareness and prevention (avoiding being bitten by mosquitoes, especially between dusk and dawn; using an effective insect repellent on exposed skin; wearing long clothing, such long sleeves, long pants, socks and shoes, to cover as much skin as practical and sleeping under an insecticide-treated bed net at the hotel). The ICTJ staff in Abidjan could also have engaged in some forms of behavioral nudging with him such as, are you taking you anti-malaria medication? With the documentation provided, it is not clear whether ICTJ's staff in Côte D'Ivoire reminded Hinzir Ziga of the risks of malaria and informed him of the importance of preventive practices.

**Conclusions of Step 6 Audit: Track and Inform**

ICTJ did not meet the duty of care baseline in step 6 by failing to recommend the use of an approved TMC for travel booking or contracting with a medical assistance vendor.

- There is no evidence that ICTJ HQ, local Abidjan staff (or an ICTJ partner TMC or medical assistance provider) tracked and informed Himzir Ziga of the medical risks of preventing and contracting malaria while working in the Abidjan, Côte D'Ivoire office.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001235
Plaintiffs Disclosures

# DO
## Step 7: Advise, Assist and Evacuate

This step involves the provision of ongoing guidance, support, and assistance when employees are abroad and find themselves in unfamiliar and risky situations. Once a situation changes when people to whom one own a duty of care obligation are traveling (changing risk compared to pre-departure assessment, incident, crisis, etc.), organizations must manage incidents to appropriately deal with the situation so as to avoid additional injury and risk to the people and the organization.

There are evidentiary gaps in the reconstruction of the time line of Himzir Ziga's pre, during and post Côte D'Ivoire travel. Since the symptoms appeared after his return to the home office, this step focuses mainly on what ICTJ did or did not do after the incident occurred (i.e., upon the onset of Himzir Ziga's symptoms).

We have limited email stream, to reconstruct how ICTJ dealt with the incident after the onset of Himzir Ziga's symptoms. When a duty of care incident occurs, most crises situations are at least initially handled over company email which have not been provided by ICTJ. It is, however, important to emphasize that the bulk of communication in Brussels is done via SMS rather than company email—as the use of SMS is a much more common practice in Europe at the time of the incident than it was in the U.S.

There are two crucial dates in this incident timeline to determine ICTJ's response: (1) the onset of Hinzir Zigi's symptoms (sometimes  between 12/5/15 and 12/15/15) and after 12/19/15 when the malaria diagnosis is communicated to Santa Falasca and the medical work certification indicating the malaria diagnosis is sent to NY headquarters. A face-to-face meeting of the key members of the duty of care team (NY) usually happens after an incident depending on the severity of the situation.

In order to reconstruct the timeline and evaluate whether ICTJ met its duty of care obligation in step 7, I would need access to company emails and text communications between key ICTJ employees (cf. list of people in appendix 2) from 9/1/2015 (when Santa Falasca planned the audit of the EU program in Côte D'Ivoire) to 1/13/16 (the time of Himzir Ziga's death). This is not an onerous request for ICTJ (cf. appendix 3).

As discussed previously, the advise and assist duty of care role was breached when Santa Falasca failed to sent Himzir Ziga to an appropriate and available Belgian medical provider upon knowledge of his illness when he returned from his business trip to Côte D'Ivoire.

## Conclusions of Step 7 Audit: Advise, Assist, and Evacuate

Based on the limited information provided to me, ICTJ did not meet its "advise and assist" duty of care baseline in step 7.

- Santa Falasca failed to sent Himzir Ziga to an appropriate and available Belgian medical provider upon knowledge of his illness and malaria-like symptoms when he returned from his business trip to Côte D'Ivoire.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001236
Plaintiffs Disclosures

# CHECK
## Step 8: Control and Analyze

*"It often takes an incident and the management of a crisis to take a closer look at their legal duty of care obligations."*
(Claus and Yost, 2011, 31)

This step ensures that employer/employee comply with the travel management policies. It also conducts after action reviews when an incident happens, tracks and analyzes data to improve the efficiency and effectiveness of the duty of care strategy and implements improvements to mitigate future risk.

## Control

ICTJ failed to assume its duty of care control function by not having a medical alert in place for flagging travel to a malaria-endemic country.

We have no evidence to ascertain whether ICTJ followed and enforced its existing policies of authorizing Himzir Ziga's travel to Côte D'Ivoire.

## Analysis

The analysis function allows for continuous improvement of the duty of care process. The feedback loop gives employers opportunities to learn from experiences (good and bad), to readjust their strategy, and fine tune the duty of care implementation plans in terms of both ongoing travel- and incident management. It also provides opportunities for making structural changes in terms of policies and procedures and the team put in place to manage and implement the duty of care activities. It is common for employers to learn from incidents and look at the most vulnerable elements and weakest link in their duty of care plan to look for improvements. This is usually done through an after action review (AAR), meeting with experts, sharing best practices with other in the industry and seeking legal advice, and sometimes discontinuation of certain activity.

We have no evidentiary knowledge of the internal ICTJ communications related to the death Himzir Ziga and its impact on the NGO. We have no knowledge whether an AAR was conducted after the death of Himzir Ziga. We do not know whether ICTJ changed any of its duty of care practices for its travelers after the death of Himzir Ziga.

In order to reconstruct the timeline and evaluate whether ICTJ met its duty of care obligation in step 8, I would need access to company emails and text communication between key ICTJ employees (cf. list of people in appendix 2) from 12/19/2015 (when ICTJ became aware of Himzir Ziga's malaria diagnosis) and 2/15/17 (when ICTJ's president was served papers by the French lawyer). This is not an onerous request for ICTJ (cf. appendix 3).

## Conclusions of Step 8 Audit: Control and Analyze

I cannot draw a conclusion whether ICTJ met the duty of care baseline in step 8 due to incomplete information.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001237
Plaintiffs Disclosures

## CONCLUSIONS

In conclusion, ICTF failed to meet common baseline duty of care practice in seven of the eights step of the model. Due to incomplete information I cannot draw a conclusion whether ICTJ met the duty of care baseline in the "analyze" part of step 8.

The most egregious mistakes in the "**Plan**" phase were the lack of risk assessment for travel to its international offices and in particular Côte D'Ivoire (step 1), failure to have a common standard malaria protocol in place (step 2) and prioritizes cost containment over employee protection in its travel management policies (step 3).

The most egregious mistakes in the "**Do**" phase were the failure to take trelatively inexpensive preventive measures (an average of $500-$800) to prevent Himzir Ziga's contracting the disease that ultimately took his life(step 4), failure to properly train and prepare Himzir Ziga and Santa Falasca for malaria prevention (step 5), omission of the local, knowledgeable ICTJ Abidjan staff to monitor and report possible breach of compliance of their visiting foreign colleague (step 6) and failure of Santa Falasca to sent Himzir Ziga to an appropriate and available medical provider upon knowledge of his symptoms (Step 7).

In doing so, ICTF failed to take reasonably foreseeable action to prevent Himzir Ziga from contracting malaria, failed to support him with appropriate treatment when becoming aware of his symptoms which ultimately resulted in his death. As a result, ICTJ opened itself up for legal liability, reputational risk and program continuity.

When auditing the duty of care practices in my consulting work with global employers (corporations, government organizations, and NGOs)—especially those sending employees to dangerous locations—I always emphasize that, in terms of incidence and prevalence, medical risks are much greater than the perceived and real security risks. Medical risks are also more certain (in terms of probability of occurring) and preventable and controllable than black swan-like security incidents. I use malaria as an example of an entirely (low cost) preventable illness, a treatable illness when done at the onset of the symptoms, but one that can easily leads to the death of the traveler if protocols are neglected.

This report and my expert opinion are based on generally accepted principles, standards and research methodology in the field of international employer duty of care at the time of the incident.

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

APPENDICES

**Appendix 1: Medical Risk Map 2015**



Source: International SOS, 2016

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001239
Plaintiffs Disclosures

## Appendix 2: List of ICTJ Employees (request for email and text communication)

| | |
|---|---|
| Michelle | Albert |
| Virginie | Amichia |
| Santa | Falasca |
| Bruce | Hubbard |
| Beverly-Ann | Jncharles-L |
| Craig | Lovve |
| Denise | McCaffrey |
| Julia | Nelson |
| Ilya | Nuzov |
| Anna Myriam | Rocatello |
| Paul | Seils |
| Mohamed | Suma |
| David | Tolbert |
| Jonathan | Tripler |
| (shan)Gaza | Walcott |
| Himzir | Ziga |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

## Appendix 3: Requests for Email Trails

What would it take to ask the IT person of a company to provide all the company emails (to and from) between **September 1, 2015 and February 14, 2017** related to a dozen named employees? Would such a request for emails: (1) be unduly burdensome for the IT Director of a company? (2) Can these emails be searched electronically through keyword searches? (3) What would be appropriate search keywords.

### 1. Is such a request of emails duly burdensome?

A request of an estimated 10,000 emails (amounting to about 1-1.5 Gigabytes) is not unduly burdensome for a company with an IT Director. An IT department should be able to transfer 1.5 Gigabytes in less than 10 minutes if they have direct access to the email account on servers they administer. If the IT department has outsourced email (say to Gmail) then a best estimate of time involved is to compare it to the time it takes to copy a Gmail account to a new computer being set up for initial use and using an IMAP mail client. An email account of more than 10,000 emails can be copied to a new computer in less than 30 minutes using a broadband connection of 8-10 megabytes. Since these transfers of the emails can be accomplished with little or no human input after copying has been initiated, there is not much of a claim for an unduly burdensome request.

### 2. Could these emails technically be provided electronically so that they can easily be searched by keyword?

Rather than reading the 10,000 emails, text analysis technology exists to help mine the data. If the messages are copied into a standard mailbox format, they can be imported into a mail client program and searched using the mail client software. Another way is for the IT department to allow access to the emails via a "dummy" account they set up for you. This should allow for easy searching.

### 3.  Search keywords

| | |
|---|---|
| Abidjan | Liability |
| Audit | Law suit |
| Breach | Malaria |
| Brussels | Medication |
| Cote D'ivoire | Sick |
| Death, Dead, Died | Strasbourg |
| Duty of care | Than di Dieudonne |
| Funeral | Travel authorization |
| Gregory | Trip |
| Himzir | Visa |
| Legal action | Ziga |

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

## EXPERT STATEMENT

I have conducted this audit in a professional and objective manner based on the information provided and my knowledge and experience as a duty of care expert. I was remunerated for this work based on prevailing expert rates for cases in the United States.

*Lisbeth Claus*

_____

Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP
Professor of Management and Global HR
Willamette University
lclaus@willamette.edu

*1/8/2019*

_____

Completed on January 8, 2019
Salem, Oregon, USA

Expert duty of care report— Civil Action No 18-cv-0057, December 31, 2018
Prepared by Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP, Willamette University

001243



**Lisbeth Claus**
**Ph.D., SPHR, GPHR, SHRM-SCP**
**Professor of Management and global HR**
**Willamette University MBA**

Dr. Lisbeth Claus published more than 100 articles about international HR in academic and professional journals. She specializes in the implications for global organizations when their employees cross borders.

She is co-author of a number of books: *#ZigZagHR: When the Best HR is no Longer HR* (with Lesley Arens), Pelckmans Pro, 2018; *International Human Resource Management,* 3rd edition (with Dennis Briscoe and Randall Schuler), Routledge, 2008; and is Editor-in-Chief of the four-volume *Global HR Practitioner Handbook* (Global Immersion Press, 2013, 2014, 2015, 2018).

Considered the premier global expert on employer duty of care, she traveled to four continents to inform employers of their obligation to protect their business travelers, international assignees, and dependents. She is the author of the 2009 International SOS *Duty of Care White Paper* viewed today as a major impetus for putting duty of care on the map for global organizations. She authored the 2012 *Duty of Care and Travel Risk Management Global Benchmarking Study,* the first empirical study on duty of care for which she earned the EMMA award for research of the year.

Other areas of research interest include implementation of progressive HR practices, HR analytics, resilient career development, and the development of a culture of health and wellbeing in international organizations.

At its inaugural annual global HR conference in March 2016, the IT Roundtable/Global HR Consortium in Seattle announced the creation of the annual *Lisbeth Claus Trail Blazer Award* in honor of her life-long dedication to the development of the global HR profession around the world. The award is presented at the Annual Global HR Conference every year in March.

A native of Belgium, she is fluent in Flemish, French, and English and has a working knowledge of German.

Foremost an educator, she has inspired thousands of learners—graduate students and practitioners—to better navigate the global scope of management.

Contact: lclaus@willamette.edu
https://www.linkedin.com/in/lisbeth-claus-3634661/

# Curriculum Vitae
## Lisbeth Claus, Ph.D., SPHR, GPHR, SHRM-SCP

## Contact Information

<u>Office Address</u>
Atkinson Graduate School of Management, Willamette University
900 State Street, Salem, OR 97301, USA
Tel: (+1) 503-370-6111, Fax: (+1) 503-370-3011
lclaus@willamette.edu

<u>Private Address</u>
P.O. Box 1210, Silverton, OR 97381, USA
Tel: (+1) 971-273-6981
write2lisbeth@gmail.com

## Education

| Institution | Degree | Year | Field |
|---|---|---|---|
| K.U. Leuven, Belgium | B.A. | 1971 | Social and Political Science |
| K.U. Leuven, Belgium | M.A. | 1973 | Sociology (Medical Sociology) |
| Saint Louis University, USA | Ph.D. | 1978 | Sociology |
| New York University, USA | Postdoctoral Fellow | 1979 | Sociology of Occupations and Professions |
| University of Missouri-Columbia, USA | Postdoctoral Fellow | 1979-80 | Gerontology |
| K.U. Leuven, Belgium | Postdoctoral Fellow | 1980-82 | Medical Sociology |
| University of San Francisco, USA | MBA | 1991 | Management |

## Certifications
SHRM-SCP (Senior Certified Professional) since 2015
GPHR (Global Professional in Human Resources) since 2004
SPHR (Senior Professional in Human Resources) since 1995

## Employment and Work Experience
2015- present   *Professor of Management and Global HR* (with tenure), Atkinson Graduate
School of Management, Willamette University, Salem and Portland, Oregon.
<u>Significant accomplishments as Professor</u>
- 2015-2018: Increased intellectual influence through subject matter expertise

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001245
Plaintiffs Disclosures

- Played a leading role in the implementation of the new performance management paradigm in progressive Pacific Northwest companies
- Recognized as the go-to-expert for duty of care in the scholastic sector
- 2016-17: Member Student Affairs Committee
- 2015-16: Chair Student Affairs Committee
- 2015-18: Member Personnel Committee
- 2015: Member Finance Search Committee

2008-2014    *Professor of Global HR* (with tenure), Atkinson Graduate School of Management, Willamette University, Salem and Portland, Oregon.
<u>Significant accomplishments as Professor</u>
- 2011-2014: Designed and implemented flipped course integrating blended learning tools
- 2011, Jerry E. Hudson Award for Excellence in Teaching Award, Willamette University
- 2008, Outstanding Scholarship Award, Atkinson Graduate School of Management
- 2014-15: Chair Student Affairs Committee
- 2011: Chair Curriculum Committee
- 2010- present: Member Personnel Committee
- 2010-present: Member and Steward, Learning Assessment Taskforce
- 2009- 2010: Chair Personnel Committee
- 2008-present: Chair, Learning Assessment Taskforce
- 2008: Chair Personnel Committee

2014-present    *Fellow of the International Human Resource Management Project*, School of Labor and Employment Relations, Pennsylvania State University, University Park, Pennsylvania.

2013-present    *Editor-in-Chief*, *Global HR Practitioner Handbook* (volumes 1-2-3), Silverton, OR: Global Immersion Press.

2013-present    *Expert Witness* on employer duty of care cases (US, UK and Canada).

2013    *Visiting Professor*, Ecole de Management Strasbourg, France.
(sabbatical semester)

2009    *Research Collaborator*, Vlerick School of Management, Gent, Belgium.
*Contributing Faculty*, Sup-de-Co Amiens, France.
(sabbatical semester)

2007-2008    *Interim Associate Dean and Associate Professor of Global HR*, Atkinson Graduate School of Management, Willamette University, Salem, Oregon.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001246
Plaintiffs Disclosures

1997-2000        *Visiting Professor of Global Retailing*, ISCID, Institut Supérieur de Commerce International Dunkerque, France.

1994- present    *Global HR Consultant, Key-Note Speaker, Webinar and Workshop Facilitator.* Erasmus International (California) and Global Immersion Press (Oregon). Significant accomplishments as Global HR Consultant and Speaker

- Worked with multinational companies to internationalize their operations, develop global competencies and globally integrate their HR policies and processes (companies include among others: Boeing, Cleanwater Services, Fike, First National Bank of Maryland, International SOS/Control Risks, Kirin Beer, Nike, Safeway, StamfordGlobal, Takeda Pharmaceuticals and Teva Pharmaceuticals, )
- Delivered keynote addresses on (global) HR and duty of care subject matters at conferences organized by ACTE, Deloitte, Ernst and Young, Eversheds, International SOS, KPMG, StamfordGlobal, PwC, Inside NGO, HR Square, SHRM/affiliated chapters (Atlanta, Connecticut, Portland Global SIG, San Diego, Savannah, Salem, Seattle, NCHRA, NHRMA), national HR associations (Canada, Brazil, Belgium, France, Israel, Mexico, Netherlands, Qatar, South Africa, and Romania), Produce Marketing Association, International Corporate Health Leadership Council and Visiting Nurses Association.
- Delivered annual holiday keynote for the Global HR Consortium in Redmond, WA 2012-2015.
- Frequent Webinar speaker for International SOS (duty of care subjects) and SHRM (global HR subjects).
- Frequent SHRM annual conference and SHRM-affiliated chapters speakers (1994-present).

1993-1994        *Acting HR Director*, Human Resource Development Department, Safeway Oakland, California. Significant accomplishments as Acting HR Director

- Designed 80-module self-study Retail Leadership Development Program (RLDP) for Safeway Store and Department Managers
- Implemented upward evaluation process and linked it to the balanced scorecard (see case study)

1991-1993        *Manager of Learning*, Safeway Supply Operations, Walnut Creek, California. Significant accomplishments as Manager of Learning

- Designed and implemented education and training program for conversion to new Manufacturing Control System at 67 food and beverage plants

1988-1991        *Account Manager*, Maritz Inc., San Francisco, California. Significant accomplishments as Account Manager

- First female account manager in Productivity Division
- Sold IdeaSystems™ to two California newspapers

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001248
Plaintiffs Disclosures

| | |
|---|---|
| 1986-1988 | *Productivity Product Manager*, Maritz Inc., Fenton, Missouri. |

Significant accomplishments as Productivity Product Manager
- Ensured quality assurance and execution of client productivity programs (Dallas Morning News, Foster Medical, Kelly Springfield, Mannington Mills, Maryland Bancorp and United Airlines Maintenance Division)

| | |
|---|---|
| 1984-1985 | *Project Head*, Maritz Inc., Fenton, Missouri. |

| | |
|---|---|
| 1983-1984 | *Survey Research Analyst*, Maritz Inc., Fenton, Missouri. |

| | |
|---|---|
| 1982-1983 | *Postdoctoral Fellow*, Gerontology, University of Missouri-Columbia, Columbia, Missouri. |

| | |
|---|---|
| 1980-1982 | *Postdoctoral Researcher*, Medical Sociology, Katholieke Universiteit Leuven, Leuven, Belgium. |

| | |
|---|---|
| 1979-1980 | *Postdoctoral Fellow*, Gerontology, University of Missouri-Columbia, Columbia, Missouri. |

| | |
|---|---|
| 1977-1979 | *Assistant Professor of Medical Sociology*, St. Louis College of Pharmacy, St. Louis, Missouri. |

Significant accomplishments as Assistant Professor
- Introduced behavioral science to the curriculum
- Developed behavioral science learning outcomes and curriculum for Pharmacy (undergraduate) and new Pharm-D (graduate) programs

| | |
|---|---|
| 1973-1975 | *Analyst*, Nationale Belgische Bond voor Geesteshygiëne, Brussels, Belgium. |

Significant accomplishments as Assistant Professor
- Developed a reporting format for service utilization and government reimbursement of mental health services at newly-developed community mental health centers in Flanders, Wallonia and Brussels

## Academic Courses Taught as Part of University Appointments

**Willamette University** (Graduate level):
- Managing Individuals, Teams and Organizations
- Managing Organizations: HR and Organization Dynamics
- Managing Organizations: HR and Teams
- HR Generalist
- HR Policies and Practices
- Global Human Resource Management
- Waterfall and Agile Project Management
- Training and Development
- Advanced HR Topics
- Experiential Global HR

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001249
Plaintiffs Disclosures

**Monterey Institute of International Studies** (Graduate level):
- Employee Selection, Training and Development
- International Organizational Behavior
- International Human Resource Management
- U.S. and Comparative Human Resource Management
- Strategic Global HR
- Global Retail Management
- Project Management and Execution

**University of Missouri-Columbia** (Family and Community Medicine Graduate program):
- Gerontology

**St. Louis College of Pharmacy** (Undergraduate level and Pharm D program):
- Behavioral Sciences for Health Practitioners
- Business Administration for Pharmacists

**St. Louis University Medical School** (Family and community medicine):
- Community Medicine Internship Course

## Chronological Record of Intellectual Contributions

### 2018
Lesley Arens and Lisbeth Claus, *#ZigZag HR: Waarom de beste HR geen HR meer is*, (Dutch) Pelkmans Pro Publishing, 2018.

Claus, L. (ed.), (2018). *Global HR Practitioner Handbook*, Volume 4. Silverton, OR: Global Immersion Press. (e-book)

Claus, L. and Baker, S. (2018). The global HR stack: External and internal tools and methodologies impacting HR. Pp. 35-63 in Claus. L. (ed.), *Global HR Practitioner Handbook*, volume 4. Silverton, OR: Global Immersion Press.

Chandler, M. Tamra (2016). *How Performance Management is Killing Performnce—and What to Do about It: Rethink. Redesign Reboot.* Oakland, CA: Berrett-Koehler Publishers. Reviewed by Claus, L. *Applied Management Journal* (2018), 19: 163-165.

### 2017
Claus, L. and Caufield, A. (2017) Employees Abroad: The US Legal Context of Employer Duty of Care to Internationally Traveling Employees W*illamette Journal of International Law and Dispute Resolution*, Volume 25: 1-24.

### 2015
Quigley, R., Claus, L. and Nixon, A. (2015). Behavioral Health Morbidity for those Studying or Working Internationally: An Exploratory Duty of Care Study. *Journal of Global Mobility*, Volume 3, Number 4, 418-435.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001250
Plaintiffs Disclosures

Claus, L. and McNulty, Y. (2015). Employer Duty of Care: the role of HRM in Managing Talent in Dangerous Locations, *European Journal of International Management*, Volume 9, Number 6, 667-672.

Quigley, R., Claus, L. and Dothan, M. (2015). Incidence of Medical Requests for Assistance from Globally Mobile Populations: Contrasting International Assignees from Different Sectors.  *European Journal of International Management*, Volume 6, Number 9, 712-736.

Claus, L. and Quigley, R. (2015). Scholastic Sector's Duty of Care: Managing the Pursuit of Education While Abroad. *URMIA* Insights (Blog). http://my.urmia.org/enews/blogs/urmia-national-office/2015/06/18/scholastic-sectors-duty-of-care-managing-the-pursuit-of-education-while-abroad

Claus, L., Maletz, S., Casoinic, D. Pierson, K. (2015). Social Capital and Cultural Adjustment of International Assignees in NGOs: Do Ego Networks Really work? *International Journal of Human Resource Management* , Volume 26, Number 20, 2523-2542.

Claus, L. (ed.), (2015). *Global HR Practitioner Handbook*, Volume 3. Silverton, OR: Global Immersion Press. (e-book).

Claus, L. (2015). Strategies and tactics for managing duty of care in a university setting. In Munoz, M. and King, N. (eds.), *Strategies for University Management. Business Expert Press.*

Claus, L. and Baker, S. (2015). The new global performance paradigm: Reinventing performance reviews.  Pp. 165-201 in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 3. Silverton, OR: Global Immersion Press.

Claus, L., Baker, S. and Ely, J.  (2015). Global HR analytics. Pp. 5-33 in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 3. Silverton, OR: Global Immersion Press.

Claus, L. (2015). *Duty of Care NGO Special Reports: A Comparison of Duty of Care Metrics and Analytics with the Global Benchmarking Study.*  London : International SOS Foundation

Claus, L. (2015). *Duty of Care and Travel Risk Management Global Benchmarking Study. Scholastic Sector.*  London : AEA International Pte. Ltd.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Engaging and Recruiting the Best Candidates via Social Media and HR Analytics at Cleveland Clinic Abu Dhabi in the United Arab Emirates, 2015, www.globalimmersionpress.com

## 2014
Claus, L. (ed.), (2014). *Global HR Practitioner Handbook*, Volume 2. Silverton, OR: Global Immersion Press. (e-book).

Claus, L.  And Aljoffe, A. (2014). Talent management in the Arab Gulf States.  In: Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 2. Silverton, OR: Global Immersion Press.

Rosen, L. and Claus, L. (2014). International employement background checks. In: Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 2. Silverton, OR: Global Immersion Press.

Nigussie, E. and Claus, L. (2014). Talent management in the emerging African markets. In: Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 2. Silverton, OR: Global Immersion Press.

Nixon, A. and Claus, L. (2014). Global worklife balance and stress management. In: Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 2. Silverton, OR: Global Immersion Press.

Claus, L. (2014). *Duty of Care and Travel Risk Management Global Benchmarking Study. Energy and Natural Resources Industry.*  London: AEA International Pte. Ltd.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Finding the human resources to fight Ebola in West Africa, 2014

## 2013
Claus, L. (ed.), (2013). *Global HR Practitioner Handbook*, Volume 1. Silverton, OR: Global Immersion Press. (e-book).

Freska, A. and Claus, L. (2013). The new global context: Is the world really flat? Pp. 5-15 in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 1. Silverton, OR: Global Immersion Press.

Claus, L. (2013). The cultural context: a template for cross-cultural management. Pp. 51-79 in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 1. Silverton, OR: Global Immersion Press.

Claus, L. and Moritz, S. (2013). The legal context of global HR. Pp. 93-115  in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 1. Silverton, OR: Global Immersion Press.

Claus, L. (2013). Global talent management: An overview.  Pp.117-137 in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 1. Silverton, OR: Global Immersion Press.

Claus, L. and Giordano, E. (2013) Global employer duty of care: Protecting the health, safety, security and well-being of employees crossing borders.  Pp. 279-299 in Claus. L. (ed.), *Global HR Practitioner Handbook,* volume 1. Silverton, OR: Global Immersion Press.

## 2012
Claus, L. (2012). *Duty of Care and Travel Risk Management Global Benchmarking Study. Switzerland.* London : AEA International Pte. Ltd.

Claus, L. (2012). *Duty of Care and Travel Risk Management Global Benchmarking Study. Asia-Pacific.* London : AEA International Pte. Ltd.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                001252
Plaintiffs Disclosures

Claus, L. (2012). *Duty of Care and Travel Risk Management Global Benchmarking Study. Sub-Saharan Africa.*  London : AEA International Pte. Ltd.
Claus, L. (2012). *Duty of Care and Travel Risk Management Global Benchmarking Study. Australia and Oceania.*  London : AEA International Pte. Ltd.

Claus, L. (2012). *Duty of Care and Travel Risk Management Global Benchmarking Study. Europe.* London: AEA International Pte. Ltd.
(Also available in German translation: *Fürsogeplicht und Management von Reiserisiken Benchmarking-Studie, Europe.*)

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Moving beyond auditing for more effective overseas supplier management at Nike, Inc. (with Merrilee Avila), 2012

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Selection of entry-level engineers in IT companies in Bangalore, India (with Deepa Rao), 2012

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, The 1500-meter athlete: A metaphor for global teamwork (with Tony Frost), 2012

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Wal-Mart Stores Inc.'s alleged non-compliance with the U.S. Foreign Corrupt Practices Act when doing business on Mexico, 2012

## 2011
Claus, L., Patrasc, A.  & Bhattacharjee, S. (2011). The Effects of Individual, Organizational and Societal Level Variables in Predicting Expatriate Performance. *International Journal of Management,* Volume 28, Number 1, 249-271.

Claus, L. (2011). Global Performance Management in MNCs: A Research Note. *European Journal of International Management, Volume* 5, Number 2, 196-199.

Claus, L. (2011). *Duty of Care and Travel Risk Management Global Benchmarking Study.* London : AEA International Pte. Ltd.

Claus, L. (2011). *Devoir de Protection et Gestion Risque Voyage : Etude Comparative Internationale.* Paris: International SOS.

Claus, L. (2011), What are your duty of care obligations to international business travelers ? *New Zealand HR Magazine*, March.
Claus, L. (2011). Protéger ses salariés à l'étranger. Une nouvelle responsabilité pour les DRH ?  *Personnel*, No 217, Février.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Activating the employee emergency system at a Yuki Bank after the Massive Japan Earthquake (with Shota Ogasawara), 2011

**2010**

Claus, L. and Yost, R. (2010). A Global View of University Risk. *URMIA Journal,* August, Volume 14, Number 1, 23-38.

Claus, L. (2010). Duty of care of employers for protecting international assignees. *Effectif,* Vol. 13, No. 4, pp. 21-23.

Claus, L. (2010). Le devoir de protection des employeurs à l'égard des employés à mobilité mondiale. *Effectif,* vol 13, N0 4, pp.32-34.

Claus, L. (2010). Duty of care of employers for protecting international assignees. *Effectif,* vol 13, N0 4, pp.21-23.

Claus, L. (2010). Le devoir de protection des employeurs à l'égard des employés à mobilité mondiale. *Effectif,* vol 13, N0 4, pp.32-34.

Claus, L. (2010) Employers' Duty of Care: Protecting Assignees, Dependents, and Business Travelers. *Innovation,* Vol. 36. No. 1, 7-8.

Claus, L. (2010) International Assignees at Risk: Employers have a duty of care for workers around the globe. Your Employer's Duty of Care Responsibilities. *HR Magazine,* Vol. 55, No. 2, 73-75.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, NGO "Savoir et Developpement" facilitates knowledge transfer in Morocco (with Ousàma Lakhdar-Ghazal), 2010

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, A new "People & Culture" organization at World Vision International (with Aida Patrasc), 2010

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Managing the risks of a global workforce at Bank of America (with Aida Patrasc), 2010

**2009**

Claus, L. and Hand, M. (2009). Customization Decisions Regarding Performance Management Systems of Multinational Companies: An Empirical View of Eastern European Firms. *International Journal of Cross Cultural Management,* Volume 9, Number 2, 237-258.

Claus, L. and Briscoe, D. (2009). Employee Performance Management Across Borders: A Review of Relevant Academic Literature. *International Journal of Management Review* Volume 11, Number 2, 175-196.

Claus, L. (2009). *Le Devoir de Protection des employeurs à l'égard des expatriés, de leurs personnes à charge et des voyageurs d'affaires.* Livre Blanc, Paris: International SOS.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001254
Plaintiffs Disclosures

Claus, L. (2009). *Duty of Care of Employers for Protecting International Assignees, their Dependents, and International Business Travelers.* White Paper, London: AEA International Pte. Ltd.

Claus, L. (2009) The Employer's Duty of Care Responsibilities for Employees Crossing Borders: A First Person Global HR Account. *SHRM Global Online*, September.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Social tensions and labor conflicts in France (with Nicolas Bayle), 2009

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Operating SFS-Qatar as a U.S. campus abroad: Sharia in action (with Aida Patrasc), 2009

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Mobilizing volunteers to contribute to Chaitanya's mission in India (with Tori Gustaveson Flanigan), 2009

### 2008
Claus, L. and Briscoe, D. (2008). Introduction (Special Issue on Global Performance Management in the European context.). *European Journal of Management*, Volume 2, Number 2, 128-231.

Claus, L. (2008). Employee Performance Management in MNCs: Reconciling the Need for Global Integration and Local Responsiveness. *European Journal of Management*, Volume 2, Number 2, 132-153.

Claus, L. and Briscoe, D. (2008). Employee Performance Management Across Borders: A Review of Relevant Academic Literature. Reprinted in Chapter 13 In: Budhwar, P., Schuler, R.S. and Sparrows, P. (eds.), *Major Works in International Human Resource Management*. Volume II: International HRM: The MNE Perspective—Compensation and Performance Management.

Briscoe. D. and Claus, L. (2008). 'Employee performance management: Policies and practices in multinational enterprises', in Varma, A. Budhwar, P. S. and DeNisi, A. (eds) *Performance Management Systems: A Global Perspective* Pp.15- 39, London: Routledge.

Briscoe, D., Schuler, R.and Claus, L. (2008). *International Human Resource Management*. 3rd edition, London/New York: Routledge.

Claus, L. (2008). What Global HR Practitioners Need to Know About the New Labor Contract Law of China, *SHRM Legal Report*, November.

Claus, L. (2008). A New Face of Diversity; Tattoos in the Workplace *Inside Business*, *Statesman's Journal*, May.

Claus, L. (2008). Preparing Talent for the Global Environment: HRD for emerging multinationals. *National HRD Network Journal*.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001255
Plaintiffs Disclosures

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Life, liberty and the pursuit of happiness at Google, 2008

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, People and planet management at New Belgium Company: Sustainable employment practices in action (with Ian Benson), 2008

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Global talent management at Standard Chartered Bank: Talent management in emerging markets in action (with Christine Thalsgård), 2008

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, ROWE at Best Buy: Total flexibility in action (with Erin Landers), 2008

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Building on field experience at the International Federation of red cross and Crescent Societies (with Martin Schjotz-Christensen), 2008

## 2007
Claus, L. (2007). Get a Virtual Grip. *People Management*, 23 August.

Claus, L. (2007). Employee Retention, Best Practices in Keeping and Motivating Employees. *B2B Willamette Valley Magazine*, March, p. 11.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Doing business in China: International ethics in action, 2007

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Open exchange at dmg world media: Global performance management in action, 2007

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Scouting talent at Google: Global recruiting in action, 2007

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Career development at IBM: Global integration in action, 2007

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Internationalization of HR at OBI; integrated recruitment strategy in action, 2007.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Balanced scorecard at PLIVA pharmaceuticals: HR strategy implementation in action, 2007

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Flexibility at PricewaterhouseCoopers: Work/life balance in action, 2007

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, HR functional excellence at Royal Dutch Shell: Competency management in action, 2007.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Post-merger integration at Teva Pharmaceuticals: "Glue technology" in action, 2007.

Claus, L. *Global HR in Action: A Series of Instructional Vignettes*, Globalization at TietoEnator: Nordic and Scandinavian management cultures in action, 2007.

**2006**
Claus, L. (2006). Global HR at Teva, Case Study and Teaching Note. *Thunderbird International Business Review, Volume* 48, Number 6, 891-905.

Claus, L. (2006). *Global HR at Teva*, Case Study and Teaching Note, Willamette University.

**2005**
Claus, L. (2005). International Assignment Types and Employee Development. *Current Issues in Management* , Volume 11, 199-218.

Claus, L. and Vloeberghs, D. (2005). Voorwaarden tot het uitbouwen van een HRM-loopbaan. Vergelijking tussen de situatie in Belgie en Nederland en de rest van de wereld. *Tijdschrift voor HRM.*

Claus, L. and Collison, J. (2005). *The Maturing Profession of Human Resources: Worldwide and Regional View. Survey Report.* Alexandria, VA: Society for Human Resource Management.

**2004**
Claus, L. and Collison, J. (2004). HR Professionalism: Current Perceptions of US HR Practitioners, *Problems & Perspectives in Management*, Volume 1, Number 4, 111-124.

Claus, L. et al. (2004). *Worldwide Benchmark Study. Emerging Trends in Global Mobility: The Assignee Perspective Research Report.* Cendant Mobility.

Claus, L. and Collison, J. (2004). *Obstacles and Development* in t*he Maturing of Human Resources: Worldwide and Regional View Survey Report.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Profile of the Maturing of Human Resources: Worldwide and Regional View Survey Report.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing of the HR Profession in the United States.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Argentina.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Belgium.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Brazil.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Canada.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004) *The Maturing Profession of Human Resources Worldwide. Summary Report for Chile.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for China.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Colombia.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Dominican Republic.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Egypt.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for France.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Israel.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Japan* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Korea.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Mexico.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for the Netherlands.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for New Zealand.* Alexandria, VA: Society for Human Resource Management.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)            001258
Plaintiffs Disclosures

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for South Africa.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Spain.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Thailand.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004) *The Maturing Profession of Human Resources Worldwide. Summary Report for Turkey.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for the United States.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for Quebec.* Alexandria, VA: Society for Human Resource Management.

Claus, L. and Collison, J. (2004). *The Maturing Profession of Human Resources Worldwide. Summary Report for North America.* Alexandria, VA: Society for Human Resource Management.

## 2003
Claus, L. (2003). Similarities and Differences in Human Resource Management in the European Union. *Thunderbird International Business Review*, Volume 45, Number 6, 729-755.

## 2002
Claus, L., Vloeberghs, D. and Pichault, F. (2002). Belgian-style Human Resource Management: A Case of Mistaken Identity. *European Management Journal*, Volume 20, Number 4, 438-446.

Cohen, D. and Claus, L. (2002). The Many Faces of Leadership. *Global HR*, October, 27-29.

Claus, L. (2002). Value-Added Global Human Resources? *The HR Bulletin, NCHRA,* March.

Global Economics (2002). Regional Economic Unions. Reviewed by Claus, L. *International Teaching Resources for Business*, 19, Spring, p. 4.

## 2001
Claus, L. (2001). *EuroHRM: The Context(s) of Human Resource management(s) in the European Union.* SHRM Foundation, May 2001.

Phillips, R. and Claus, L. (2001). Corporate Social Responsibility and Global HR. *International Focus.*

Claus, L. (2001). The Future of HR. *Workplace Visions,* No. 6, p. 2-3.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                    001259
Plaintiffs Disclosures

Claus, L. (2001). 21st Century Challenges and Opportunities for Global HR?"*CCHRA Notes,* November.

Claus, L. (2001). Heeft uw bedrijf een rampenplan? *HRMagazine,* November, p. 16.

Claus, L. (2001). Disaster Recovery Hits Home. *Globalhr,* October, p.17.

Claus, L. (2001). Pink Slip Party. *Globalhr,* August, p. 56-7.

Claus, L. (2001). Spreading the Knowledge. *Globalhr,* May, p. 51.

Claus, L. (2001). Seeking Compensation. *Globalhr,* November/December, 19, p. 51.

**2000**
Claus, L. (2000). From Dot to Dot. *HR World Magazine*, November/December, 18, p. 35.

Claus, L. (2000). E-Selection. *HR World Magazine*, September/October, 1,  p.41.

Claus, L.  (2000). New for Old. *HR World Magazine*, July/August, 16, p. 35.

Claus, L. (2000). 'HR and the Global Paradigm.' Resources, August, pp. 27-29.

**1999**
Claus, L. (1999). Crosscultural Savvy and Global Trade: Paying Attention to the Soft Side of International Business. *Sourcebook Supplement to The Packer,* February.

**1998**
Claus, L. (1998). The Role of International Human Resource in Leading a Company from a Domestic to a Global Corporate Culture. *Human Resource Development International, Volume* 1, Number 3, 309-326.

**1997**
Coate, M/ B.  and Rodrigues, A.E.  (1997). The Economic Analysis of Mergers. Monterey, CA: Center for Trade and Commercial Diplomacy, Monterey Institute of International Studies. Reviewed by Claus, L.  *Journal of Public Policy & Marketing*, Vol, 16, No.2.

**1996**
Claus, L. (1996). *Cataloger Hanna Andersson's Entry into the Japanese Market.* Monterey Institute of International Studies.

Claus, L. (1996, revised 2004). *Performance Evaluation at Safeway.* Monterey Institute of International Studies.

**1994**
Claus, L. et al. (1994). *Introduction to the Food Industry.* Safeway Inc.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001260
Plaintiffs Disclosures

**1991**

Claus, L. (1991). Total Quality Management: A Healthcare Application. *Total Quality Management*, Volume 2, Number 2, 131-148.

**1986**

Claus, L. (1986). The Development of European Medical Sociology: An overview. *Newsletter of the European Society of Medical Sociology*, Volume 2, Number 1, 2-20.

**1983**

Brown. S. and Claus. L. (1983). Unionization and Professionalization: A Cross-Cultural Analysis. *Gezondheid and Samenleving*, Volume 4, 189-198.

Claus, L. (1983). The Development of Medical Sociology in Europe. *Social Science and Medicine*, Volume 17, Number 21, 1591-1597.

**1982**

Claus, L. (1982). Dental Student Attitudes towards the Elderly and Training in Geriatric Dentistry. *International Dental Journal*, Volume 32, Number 4, 371-378.

Claus, L. and Peeters, R. (1982) "Sociology of Pharmacy" in Pharmaceutical Education: An Evaluation of Curriculum Development Attempts. *Farmaceutisch Tijdschrift van België*, 417-429.

Claus, L. (1982). *The Growth of a Sociological Discipline: On the Development of Medical Sociology in Europe* (*Volume 2: Case Studies*).  K.U. Leuven: Sociological Research Institute.

Claus, L. (1982). *The Growth of a Sociological Discipline: On the Development of Medical Sociology in Europe (Volume 1: The General Study).*  K.U. Leuven: Sociological Research Institute.

**1981**

Claus, L. (1981). The Development and Status of German Medical Sociology. *Medizinsociologsiche Mitteilungen,* Volume 8, Number 1, 41-50.

Ingman, S.R. and Claus, L. (1981). Preadmission Assessment for Geriatric Patients. *Quality Review Bulletin*, September:  3-5.

Claus, L. (1981).  *European Medical Sociologists: A Directory of People Active in the Sociology of Health and Illness.* K.U. Leuven: Sociological Research Institute.

**1978**

Claus, L. (1978). *Health and Illness Behavior of Women.* Saint Louis University, USA, Department of Sociology (Prof. Rodney Coe).

**1976**

Claus, L. and Nuyens, Y.  (1976). La Enseňanza dela Sociologia de la Medicina en Europa y USA. *Papers Revista Sociologia*, Number 5, 11-19.

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)          001261
Plaintiffs Disclosures

**1973**
Claus, L. (1973). *Medische Opleiding in Verandering*. Katholieke Universiteit Leuven, Belgium, Departement sociologie (Prof. Yvo Nuyens).

## Languages
Flemish/Dutch      Native
French             Fluent
English            Fluent
German             Working knowledge

## Professional Memberships
- Academy of Management (AoM)
- Society for Human Resource Management (SHRM)
- Northwest Human Resource Management Association (NHRMA)
- Salem SHRM chapter
- Association for Human Resource Management in International Organizations (AHRMIO)
- College and University Professional Association for Human Resources (CUPA)
- Global Human Resource Consortium (GHRC)/IT HR Rountable (ITHR)

## Leadership and Service Activities
- 2017-2019 Global HR Conference, GHRC/ITHR, Organizing Committee Member
- 2016 Inaugural Global HR Conference, GHRC/ITHR, Organizing Committee Member
- U.S. Volunteer Coordinator, NGO Vergessene Kinder, Heiligenhaus, Germany, 2015–present
- Initiated '65 but not forgotten' campaign to feed 65 Romanian forgotten children and their families for one year so that they can stay in school and get an education, 2016.
- Philanthropic Education Organization (P.E.O.) Oregon Chapter CX, Education Committee Member, 2014, Chair, 2015-present
- Student Affairs Committee, Atkinson Graduate School of Management, Chair: 2014-2016; member 2016-present
- Personnel Committee, Atkinson Graduate School of Management, Member 2010-present
- Curriculum Committee, Atkinson Graduate School of Management, 2011
- Member and Steward, Learning Assessment Taskforce, Atkinson Graduate School of Management, Chair 2010-2013
- Personnel Committee, Atkinson Graduate School of Management, Chair 2009- 2010
- Learning Assessment Taskforce, Atkinson Graduate School of Management, Chair, 2008-2013, member 2013-present
- Personnel Committee, Atkinson Graduate School of Management, Chair 2008
- Personnel Committee, Atkinson Graduate School of Management, Member 2006-2008
- Yismehu, Salem, OR, Board Retreat Facilitator, 2013
- Mercy Corps, International assignee performance management action research, 2009-2012

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)
Plaintiffs Disclosures                                    001262

- SHRM Global Learning System (3ʳᵈ edition), Subject Matter Expert, SHRM/Holmes Corporation, 2008
- Editorial Board of the *International Journal of Organization Theory and Behavior*, member 2008 – present
- Global, SHRM, Expert Panel Member, 2005-2008
- Peer Reviewer of Papers for: *Academy of Management Conference, Western Academy of Management, Thunderbird International Business Review, Journal of International Business Studies, International Journal of Organization Theory and Behavior, International Journal of Human Resource Management, Journal of Global Mobility, European Journal of Management*
- Groupe Sup-de-Co Amiens, France, Member of the Scientific Council, 2007- 2012
- Curriculum Committee, Atkinson Graduate School of Management,  Chair 2004-2006
- Career Development Review, Atkinson Graduate School of Management, Chair, 2003
- Curriculum Committee Member, Atkinson Graduate School of Management, 2003-2004
- Employee and Organizational Development, SHRM, Expert Panel Member, 2004-2005
- SHRM Global, President 2003
- SHRM Global Learning System (1ˢᵗ edition), SHRM/Sage Corporation, Lead Subject Matter Expert and Coordinator, 2002-2003
- Executive Taskforce, SHRM Global Integration, Chair 2002-2003
- SHRM Global Forum, President Elect, Vice President Finance, Executive Committee, Board of Directors 2002
- SHRM Global Forum, Vice President, Chair Chapter Outreach, Board of Directors 1999-2001
- Eight Annual World Business Congress, *International Management Development Association*, Monterey, Co-Track Chair Global Corporate Strategy, June 1999
- *School-to-Work Program*, Everett Alvarez High School, Senior Project, Salinas, California, Business Community Panelist, May 1999
- *Central Coast Human Resource Association*, Member of the Board of Directors, Secretary and Educational Liaison 1999-2000
- *Central Coast Human Resource Association*, Member of the Advisory Board 2000-2001.
- *BEAM-Business Education Alliance of the Monterey Peninsula*, Member of the Board of Directors and Chair of the Grants Committee 1997-2000

## Professional Awards

- 2016, Creation of the annual LISBETH CLAUS TRAILBLAZER AWARD by the IT Roundtable/Global HR Consortium in honor of her lifelong dedication to the development of the global HR profession around the world, Redmond, WA
- 2013, EMMA Award for Best Global Mobility Research, Forum for Expatriate Management, America region
- 2012, Finalist HR Academic of the Year, Ontario Human Resource Association, Toronto, Canada
- 2009, Northwest Human Resource Management Association, Distinguished Member Award

Ziga et al v. ICTJ, No. 18-cv-57 (SDNY)                     001263
Plaintiffs Disclosures